ANTONIA DÁVILA, Plaintiff and Appellant, v. ARTURO E. VALDEJULLY DELPIN, NOW HIS HEIRS, ETC., Defendants and Appellees.

No. 12461. Decided December 8, 1961.

98

*Leopoldo Tormes* for appellant. *Pedro Muñiz Ramos, Rivera Zayas, Rivera Cestero* and *Rúa* for appellees.

Division composed of Mr. Chief Justice Negrón Fernández, Mr. Justice Blanco Lugo, and Mr. Justice Dávila.

MR. JUSTICE DÁVILA delivered the opinion of the Court.

The trial judge decided that plaintiff was the daughter of Arturo E. Valdejully, predecessor of defendants, but it

dismissed the complaint of filiation. It grounded its judgment on that the action having been predicated on subdivision 2 of § 125 of the Civil Code,[1] 31 L.P.R.A. § 504, the evidence presented concerning the uninterrupted possession of the status of a natural child did not merit credence.

Plaintiff maintains on appeal that the trial court erred in not admitting certain documentary evidence—a photograph of the plaintiff, another of her alleged father, and appellant's marriage certificate—and in not giving credit to the evidence presented in support of the allegation of possession of the status of a natural child.

Since the finding of fact of the trial court to the effect that "once that the plaintiff was begotten, Arturo Valdejully did not take care of her maintenance nor of support, nor in any manner, neither publicly nor privately, held her as his daughter," establishes that the plaintiff is daughter of defendants' predecessor, it is unnecessary to consider the errors assigned as to the nonadmission of the documentary evidence, since the only purpose of presenting the photographs and plaintiff's marriage certificate was to prove the paternity.

■ From our examination of the evidence presented, it clearly appears that the finding of the trial court to the effect that plaintiff did not enjoy the possession of the status of the natural daughter of Arturo E. Valdejully, is supported by the evidence, there being no reason, therefore, for altering said finding.

■ Now, it has been almost threescores since the Legislative Assembly of Puerto Rico set forth its view as to how

---

[1] In the pertinent part of this suit § 125 provides:

"The father is obliged to recognize the natural child:

"1. ........ .

"2. Where the child has uninterruptedly enjoyed the condition as of a natural child of the defendant father justified by acts of the same father or of his family.

"3. When the mother was known to have lived in concubinage with the father, both during her pregnancy and at the time of birth of the child..."

this Court should dispense justice and although the provisions contained in the Act of March 12, 1903, 4 L.P.R.A. § 36 **are** not imperative, *Rivera* v. *Heirs of Lugo*, 42 P.R.R. 183 (1931), the truth is that the underlying spirit of this provision is of enormous persuasive force to guide every court to dispense justice.

The afore-cited provisions reads:

". . . In its deliberations and decisions, in all cases, civil or criminal [the Supreme Court] shall not be confined to the errors in proceeding (procedure) or of law only, as they are pointed out, alleged or saved by the respective parties to the suit, or as set fourth (forth) in their briefs and exceptions, but in furtherance of justice, the court may also take cognizance of all the facts and proceedings in the case as they appear in the record, and likewise consider the merits thereof, so as to promote justice and right and to prevent injustice and delay."

■ And it is thus that justice should be administered. It is not a struggle where the ablest achieves victory. It is the duty of every court to see that justice is imparted to whomever is entitled to it, according to the sound discretion of the judge. *Piovanetti* v. *Vivaldi*, 80 P.R.R. 108 (1957).

It is that same principle underlying Rule 54 (c) of the Rules of Civil Procedure of 1943 and Rule 44.3 of the Rules of Civil Procedure of 1958, the latter providing substantially the same as those of 1943, that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings. . ."

In *Massachusetts Bonding & Ins. Co.* v. *State of N. Y.*, 259 F.2d 33 (2d Cir. 1958), Judge Clark states thus at p. 40 upon applying the corresponding federal rule:

"Of course it is always desirable to urge to the district court the legal theories upon which a party claims decision. But as Rule 54 (c), F.R.Civ.Proc., points out, it is the court's responsibility to award relief required by the facts on any proper ground, regardless of the theories urged by the parties. Thus on numerous occasions, as noted in the margin, we, as well as other

courts, have granted relief on legal theories not presented by the parties to the district court."

See also, *Brotherhood of Locomotive F. & E.* v. *Butte, A. & P. Ry. Co.*, 286 F.2d 706 (9th Cir. 1961); 3 Barron & Holtzoff 35, § 1194 (1958 ed.); 6 Moore, Federal Practice 1207, § 54.62 (2d ed.).

■ Recently, in *González* v. *Heirs of Martín*, 83 P.R.R. 737 (1961), we stated that "what both Rule 54(c) [of 1943] and Rule 44.3 of the Rules of Civil Procedure of 1958 actually provide is that judgment be rendered on the findings and not necessarily on the pleadings."

With these considerations in mind, it is proper to determine whether plaintiff has a right to be granted the claim of filiation because her mother lived in concubinage with Valdejully during her pregnancy and at the time of her birth, as provided by subdivision 3 of § 125 of the Civil Code, in view of the fact that the trial court set forth the following findings of fact upon deciding the instant case:

"3. In 1925 Felícita Dávila was approximately fifteen years old. She lived with her father, Antonio Dávila Rodríguez in the Colonia Teresa at Salinas. During that year, her father used to send her to a neighbor's house so that Felícita be trained in needlework. It was there that Arturo Valdejully met her. They fell in love and some time later Antonia (*sic*) Dávila and Arturo Valdejully began to indulge in sexual relations occasionally.

"4. At the beginning of 1926 there existed in the city of Ponce a commercial entity under the firm name of Torres y Ramírez. One of the partners invited Valdejully to join them. He accepted the offer and moved to the city of Ponce. He opened "La Carmelita" Store, which was located in front of the recreation park and lodged at a hotel located in Comercio Street in this city. At the same time Valdejully rented a room in Callejón Comercio at Ponce and moved Felícita Dávila into it. He visited her frequently and had sexual relations with her for a period of approximately seven months. As a result of said sexual relations Felícita Dávila became pregnant. About two months before she gave birth, Valdejully went to the United

States on a business trip, having taken Felícita to live with her parents at Colonia Teresa in Salinas. On said occasion Valdejully gave Felícita the amount of $150 to cover the expenses of childbirth."

These findings are amply supported by the evidence. Felícita Dávila stated on direct examination that she met Valdejully at Salinas about 1924 or 1925; that she had relations with him in said town and that at the beginning of 1926 she went to Ponce to live with him; that they lived in Callejón Comercio for about eight months; that she became pregnant; that he supported her during all the time she was in Ponce and that when he went to the United States on a business trip she stayed at her home in Salinas, where plaintiff was born on September 27, 1926. That when she stayed at Salinas he gave her $150 to cover the expenses of childbirth.

On cross-examination she confirms what she set forth upon direct examination. From the transcript of evidence we copy at p. 58 *et seq.*:

"DEFENDANTS: Going back, doña Felícita: you say that when you came to Ponce you went to live with Arturo Valdejully; that you lived in a place called Callejón........
 Callejón Comercio.
Where there is now a blacksmith's shop?
 A blacksmith's located there.
And he lived with you there, under the same roof?
 Yes, sir, he always went there.
Under the same roof or how?
 We lived there.
DEFENDANTS: Did he go there visiting, or did he lived there?
WITNESS: We lived there.
It is important that you make that clear.
 Well, yes, of course.
You say that he lived there with you every night?
 Yes, sir.
He had his clothes there, as if you were married?
 Well, his clothes... he, because he went there daily. He had his clothes at a hotel.

He was staying at a hotel?

 Yes, sir.

Do you remember the hotel?

 I don't know if it was there at a hotel on Comercio Street.

A hotel on Comercio Street in...

 In about '26, '25 to '26.

In 1926?

 Yes, sir.

We agree that Antonia was born on September 27, 1926?

 Yes, sir.

Was she born already or not?

 No, sir.

DEFENDANTS: Were you pregnant?

WITNESS: Yes, sir.

Was that in 1926?

 Yes, sir.

He lived in a hotel and then at night went to you?

 He rented two apartments, two rooms.

Such as a living room and a bedroom?

 Yes, sir.

Aside from that, you were alone?

 Yes, sir.

Completely alone?

 Yes, sir.

Then you didn't work?

 No, sir, I didn't work.

You didn't have any business?

 No, sir, nothing. It was when I was starting in life. I was fifteen (15) years old.

. . . .

You say that shortly afterwards he went to the United States?

 After that he left.

When did he leave afterwards?

 You mean the date?

How long?

 I lived there eight (8) months, about 7 or 8 months, around that. Shortly thereafter.

That was before Antonia was born?

 Yes, sir.

Then that was how long after you had gone back to Salinas to your father's house that you gave birth to Antonia?

I gave birth to Antonia 15 or 20 days afterward. I was with him for a short time.

You were there in 1926 until shortly before September?

Yes, sir.

Then you went back?

To my father's house.

You were there in Callejón Comercio in the rooms he rented?

Yes, sir."

. . . .

Further on he again asks her:

"From whom if you remember, did you rent the rooms or two rooms in Callejón Comercio?

I do not recall because he was the one who rented them."

When plaintiff's father testified he was asked with whom had his daughter lived and he answered that "the one who brought her here from Salinas was Arturo Valdejully, he brought her to Ponce." (Tr. Ev. 194.)

This evidence shows that Valdejully, a bachelor, meets Felícita Dávila, also single, fifteen years old, in Salinas. He makes love to her, has intimate relations and when he moves to Ponce he takes her to live in some rooms he rented in the afore-mentioned city. When asked by counsel for the defense if Valdejully lived there every night, Felícita answers yes. She also states that Valdejully had a room at a hotel where he kept his clothes but when counsel for defendants asked if he just went over or if he lived there, she answers "we lived there." It is significant that at this stage of the cross-examination counsel for the defense made known to the witness the importance of making clear and establishing whether Valdejully "went there visiting or lived there." It is then that Felícita affirms that he lived there. Obviously, counsel for the defense was aware that the evidence could show a status of concubinage. When the young girl becomes pregnant, and Valdejully has to go to the United States on a business trip, he leaves her at her parents' house in Salinas but gives her money to cover the expenses of child-

birth. When Valdejully returned from the United States he definitively ended his relations with plaintiff's mother. Although the trial judge upon setting forth his findings of fact affirms that Valdejully frequently visited Felícita Dávila, plaintiff's mother, the truth is that the evidence on which he based his findings and the only proof on that score establishes that Valdejully slept at Felícita's house every night since no other meaning can be given to the latter's statement on cross-examination. Thus we interpret the trial judge's finding of fact.

 This state of facts clearly determines a status of concubinage pursuant to the norm established by our decisions. In *Sánchez* v. *Díaz*, 78 P.R.R. 771, 774 (1955) we stated that:

"We have repeatedly held that the concubinage contemplated by subdivision 3, § 125 of the Civil Code—31 L.P.R.A. § 504— refers to the condition of a man and a woman living together as husband and wife without being actually married. *López* v. *Rodríguez*, 68 P.R.R. 700; *Bianchi* v. *Heirs of Bianchi*, 67 P.R.R. 557; *Montañez* v. *Rodríguez*, 67 P.R.R. 198."

That Felícita Dávila and Valdejully lived as husband and wife is established by the uncontroverted evidence believed by the trial judge. Both were unmarried; Valdejully takes Felícita from Salinas to Ponce, where he puts her up in some rooms he rents in Callejón Comercio of that city and every night went to sleep at that place. The fact that Valdejully kept a room in a hotel where he kept his clothes does not alter in the least the foregoing situation. In *Estela* v. *Heirs of Medraño*, 51 P.R.R. 531, 532 (1937) we stated that: "This court has never said that concubinage cannot coexist with the maintenance of a separate place of abode or ostensible place of abode where the paramour keeps his clothes and a bed..." And further on, at p. 536 we said that: "As in the *Bird* case the court was considering the fact of separate residence merely as a circumstance bearing on the question of

concubinage *vel non* just as it would have considered any other circumstance which might have had a bearing on that question. The case is not authority for the contention that the maintenance of a separate residence is incompatible with the existence of a state of concubinage. If it could be considered as authority for such a contention then, to that extent, it must be deemed to have been overruled in *Góñez* v. *Palmieri*, 50 P.R.R. 439." Neither does the fact that plaintiff's mother was not living in Ponce with Valdejully at the time of childbirth alter the situation. The evidence showed, as established by the trial court, that Felícita became pregnant while she was living with Valdejully and it was not until the latter had to go to the United States on a business trip that she returned to Salinas, but Valdejully gave her enough money to cover her expenses, which goes to prove that the concubinage lasted until plaintiff's birth. His trip to the United States cannot have the effect of cutting off the existing relations. In *Estela* v. *Heirs of Medraño*, 44 P.R.R. 143 (1932) we held that the fact that the father died before the birth of the child did not in any manner bar the application of the principle which requires that the concubinage must exist at the time of the birth of the child. Likewise, Valdejully's departure for the United States on a business trip after personally taking Felícita to Salinas and giving her the money to cover the expenses of childbirth, cannot be considered as having the effect of ending the relations existing between Valdejully and plaintiff's mother.

■ In a recent study on this matter, Calderón, *La Filiación en Puerto Rico*, 21 Rev. C. Abo. P.R. 275 (1961) at p. 287 states:

"Briefly, from the foregoing we can reach the following conclusions:

1. Concubinage may exist even if the man and woman do not live together permanently;

2. The mere fact of having a mistress and visiting her occasionally was not enough to establish a concubinary relation.

It was necessary that there be a relatively permanent quasi-marital relation between the man and woman, a relation which although not identical to marriage, was stronger and more definite than that in which a man merely supports a mistress."

To the foregoing we must add that the relative permanence adduced in the above-cited section does not have to extend beyond the contents of § 125 itself, that is, during the pregnancy and at the time of the birth of the child. If the relations establishing concubinage last during the time required by the Code, the requirement therein provided is complied with. Obviously in the case at bar the concubinage lasted for the time required by the statute.

■ It is proper to repeat what we stated in *Colón* v. *Heirs of Tristani*, 44 P.R.R. 163, 200 (1932) "It would be an unjust law that in which after the existence of a father is shown, the means are not given to compel him to assume the responsibilities contracted with the child by him engendered. That could not have been the thought of the Legislature; that can not be the spirit of the provisions of section 193 [§ 125, 1930 ed.] of the Civil Code."

Since the judgment should be rendered on what has been proved and not necessarily on the allegations and since the findings of fact made by the trial court as well as the evidence presented, establish that plaintiff's mother and the predecessor of the defendants lived in concubinage during the pregnancy and at the time of plaintiff's birth, the judgment appealed from must be reversed and the action of filiation filed in the case at bar granted.

The judgment rendered by the Superior Court, Ponce Part, on August 6, 1957 will be reversed and another rendered instead designating plaintiff Antonia Dávila as the acknowledged natural child of Arturo E. Valdejully. The case will be remanded for further proceedings.