ANTONIA DÁVILA, demandante y recurrente *v.* ARTURO E. VALDEJULLY DELPÍN, HOY SU SUCESIÓN, ETC., demandados y recurridos.

*Número:* 12461 *Resuelto:* 8 de diciembre de 1961.

*Leopoldo Tormes,* abogado de la recurrente; *Pedro Muñiz Ramos, Rivera Zayas, Rivera Cestero* y *Rúa,* abogados de los recurridos.

Sala integrada por el Juez Presidente Señor Negrón Fernández como Presidente de Sala, y los Jueces Asociados Señores Blanco Lugo y Dávila.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

El juez de instancia determinó que la demandante era hija de Arturo E. Valdejully, causante de los demandados, mas declaró sin lugar la demanda de filiación. Fundó su fallo en que habiéndose instado la acción basada en el Inciso 2 del Artículo 125 del Código Civil, (¹) 31 LP.R.A. 504, no le me-

---

(¹) Dispone así el artículo 125 en la parte pertinente a este pleito:

"El padre está obligado a reconocer al hijo natural:

"1. . . . . . . . .

"2. Cuando el hijo se halle en la posesión continua del estado de hijo na-

reció crédito la prueba presentada sobre posesión continua del estado de hija natural.

Sostiene la demandante en el recurso interpuesto que el tribunal de instancia erró al no admitir cierta evidencia documental—una fotografía de la demandante, otra de su alegado padre y el certificado de matrimonio de la recurrente—y al no darle crédito a la prueba presentada para sostener la alegación de posesión del estado de hija natural.

Como la determinación de hecho del tribunal de instancia al efecto "de que una vez procreó a la demandante, Arturo Valdejully no se ocupó de su sostenimiento, ni alimentación, ni en forma o manera alguna ni pública ni privadamente la tuvo como hija suya", establece que la demandante es hija del causante de los demandados, huelga considerar los errores apuntados sobre la no admisión de la evidencia documental ya que el único propósito de presentar las fotografías y el acta de matrimonio de la demandante era demostrar la paternidad.

■ Del estudio que hemos hecho de la evidencia presentada, claramente surge que la determinación del tribunal de instancia, al efecto de que la demandante no gozó de la posesión del estado de hija natural de Arturo E. Valdejully está sostenida por la evidencia, por lo que no hay lugar para alterar dicha determinación.

■ Ahora, hace ya casi seis decenios, que la Asamblea Legislativa de Puerto Rico expuso un criterio en cuanto a cómo debía dispensarse la justicia por este Tribunal y si bien lo expresado por la Ley del 12 de marzo de 1903, 4 L.P.R.A. 36, no es imperativo, *Rivera* v. *Sucn. Lugo*, 42 D.P.R. 189 (1931), lo cierto es que el espíritu que enmarca este precepto es de enorme fuerza persuasiva para guiar a todo tribunal a impartir justicia.

---

tural del padre demandado, justificada por actos del mismo padre o de su familia.

"3. Cuando la madre fue conocida viviendo en concubinato con el padre durante el embarazo y al tiempo del nacimiento del hijo."

"4. . . . . . . . . .

Dispone así el ameritado precepto:

". . . En sus deliberaciones y fallos en todos los asuntos, tanto en lo civil como en lo criminal, [el Tribunal Supremo] no se limitará solamente a infracciones de ley o quebrantamientos de forma, según fueren señalados, alegados o salvados por los litigantes, o según se hiciera constar en sus exposiciones y excepciones sino que con el más alto fin de justicia, el Tribunal puede también entender en todos los hechos y tramitaciones en la causa tal como aparecieren en autos, considerando en igual forma sus méritos para la mejor administración de justicia y del derecho, y evitar injusticias y demoras."

▆ Y es que así debe dispensarse la justicia . No es lidia en la que el más hábil obtiene la victoria. Es obligación de todo tribunal velar porque se le haga justicia a aquel que de acuerdo con el más sano criterio del juzgador tiene derecho a ella. *Piovanetti* v. *Vivaldi*, 80 D.P.R. 108 (1957).

Ese es el mismo principio que inspiró la Regla 54 (*c*) de las de Enjuiciamiento Civil de 1943 y la 44.3 de las de Procedimiento Civil de 1958 al disponer esta última, sustancialmente igual a la de 1943, que "[t]oda sentencia concederá el remedio a que tenga derecho la parte a cuyo favor se dicte, aún cuando ésta no haya solicitado tal remedio en sus alegaciones . . .".

En *Massachusetts Bonding & Ins. Co.* v. *State of N. Y.*, 259 F.2d 33 (2do. cir. 1958) se expresa así el Juez Clark a la pág. 40 al aplicar la regla correspondiente de las federales:

"Claro está que siempre es preferible que se le formulen a la corte de distrito las teorías legales en las cuales la parte basa su caso. Pero según dispone la Regla 54 (*c*), Reglas Federales de Procedimiento Civil, es responsabilidad de la corte conceder el remedio a que se tiene derecho de acuerdo con los hechos, independientemente de las teorías formuladas por las partes. Así, en innumerables ocasiones, según se apunta al calce, nosotros al igual que otras cortes, hemos concedido remedios fundándonos en teorías legales que no le plantearon las partes a la corte de distrito."

Véase además *Brotherhood of Locomotive F. & E.* v. *Butte A. & P. Ry. Co.*, 286 F.2d 706 (9no cir. 1961), 3 Barron & Holtzoff § 1194 pág. 35 (ed. 1958) ; 6 Moore's Federal Practice § 54.62 pág. 1207 (2da ed.).

▉ Recientemente en *González Muñiz* v. *Sucn. Martín Quiñones*, 83 D.P.R. 765 (1961) expresamos "que tanto la Regla 54(c) [de las de 1943] como la 44.3 de las de Procedimiento Civil del 1958, en efecto lo que proveen es que la sentencia se dicte teniendo por base lo probado y no necesariamente lo alegado."

Con estas consideraciones en mente, procede determinar si la demandante tiene derecho a que se declare con lugar la demanda de filiación, por haber vivido su madre durante el embarazo y a la fecha de su nacimiento, en concubinato con Valdejully, tal cual lo dispone el inciso 3 del art. 125 del Código Civil, en vista de que el tribunal de instancia hizo las siguientes determinaciones de hechos al fallar el presente caso:

"3. Para el año 1925 Felícita Dávila tenía quince años de edad aproximadamente. Vivía en compañía de su padre Antonio Dávila Rodríguez en la Colonia Teresa de Salinas. Durante el transcurso de ese año, su padre acostumbraba enviarla a casa de una vecina suya con el propósito de que Felícita se entrenara en labores de costura. En ocasión de ello, Arturo Valdejully la conoció. Se enamoraron y poco tiempo después Antonia [sic] Dávila y Arturo Valdejully comenzaron a sostener relaciones sexuales ocasionalmente.

"4. En los comienzos del año 1926 existía en la ciudad de Ponce una casa comercial que operaba bajo la razón social Torres y Ramírez. Uno de los socios de la casa invitó a Valdejully a asociarse con ellos. Este aceptó la oferta y se trasladó a la ciudad de Ponce. Estableció la Tienda "La Carmelita", la cual radicaba frente a la plaza de recreo y se hospedó en un Hotel que radicaba en la Calle Comercio de esta ciudad. Al propio tiempo, Valdejully alquiló una habitación en el Callejón Comercio de Ponce e instaló en ella a Felícita Dávila. La visitaba frecuentemente y sostuvo relaciones sexuales con ella en dicho lugar por espacio de siete meses aproximadamente. Como re-

sultado de dichas relaciones sexuales Felícita Dávila quedó en estado de embarazo. Alrededor de dos meses antes de ella dar a luz, Valdejully se trasladó a Estados Unidos en viaje de negocios, habiendo llevado a Felícita a vivir de nuevo en casa de los padres de ésta en la Colonia Teresa de Salinas. En dicha ocasión, Valdejully le hizo entrega a Felícita la suma de $150.00 con el objeto de que ésta pudiera sufragar los gastos incidentales al parto."

Estas determinaciones están ampliamente sostenidas por la prueba. Felícita Dávila declaró en el examen directo que conoció a Valdejully en Salinas allá para el 1924 ó 1925, que tuvo relaciones con él en dicho pueblo, y que a principios de 1926 se fue para Ponce a vivir con él; que se fueron a vivir al Callejón Comercio donde vivió como ocho meses; que salió encinta; que durante todo el tiempo que vivió en Ponce éste la mantuvo y que cuando salió para los Estados Unidos en viaje de negocios ella se quedó en su casa de Salinas donde nació la demandante el 27 de septiembre de 1926. Que al quedarse en Salinas le entregó $150.00 para los gastos del alumbramiento.

En la repregunta, reafirma lo expuesto en el examen directo. Copiamos de la página 58 y siguientes de la T. de E.:

"Demandados: Volviendo atrás, doña Felícita: usted dice que cuando vino aquí a Ponce usted vino a vivir con don Arturo Valdejully, que fueron a vivir a un sitio que se llamaba Callejón . . .

Callejón Comercio.

¿Dónde hoy está una herrería?

Una herrería que aparece allí.

¿Y el vivía allí con usted, allí bajo techo?

Sí señor, él iba siempre.

¿Bajo techo o cómo?

Vivíamos allí.

Demandados:

¿El iba por allí o vivía?

Testigo:

Nosotros vivíamos allí.

Porque es importante que aclare eso.

**Bueno, sí, seguro.**

¿Dice que él vivía allí durante todas las noches allí con usted?

Si señor.

¿Allí tenía su ropa, como si fueran casados?

Bueno su ropa . . . él, porque él iba a diario allí. El tenía sus ropas en un hotel.

¿El estaba en hotel?

Sí señor.

¿No recuerda el Hotel?

No sé si era allí un Hotel en la Calle Comercio.

¿Un Hotel en la Calle Comercio allá para el . . .

Para el 26, para el 25 ó 26.

¿Para el 1926?

Si señor.

¿Quedamos en que Antonia nació el 27 de septiembre de 1926?

Sí señor.

¿Ya ella estaba nacida o todavía no había nacido?

No señor.

DEMANDADOS:

¿Usted estaba encinta?

TESTIGO:

Sí señor.

¿Eso fue en el año 26?

Sí señor.

¿El vivía en un Hotel y entonces iba de noche donde usted?

El alquiló dos departamentos, dos habitaciones.

¿Como si dijéramos sala y dormitorio?

Sí señor.

¿Fuera de eso usted estaba sola?

Sí señor.

¿Completamente sola?

Sí señor.

¿Usted no trabajaba entonces?

No señor, yo no trabajaba.

¿No tenía ningún negocio?

No señor, nada. Era cuando yo empezaba a vivir la vida. Tenía quince (15 ) años.

. . . . . . .

¿Usted dice que poco tiempo después él se fue para Estados Unidos?

Después de eso él salió.

¿Cuándo se fue el después?

¿Usted quiere el tiempo?

¿Cuánto tiempo?

Yo vivía allí ocho (8) meses, de 7 a 8 meses, una cosa así. Al poco tiempo.

DEMANDADOS:

¿Eso fue cuando todavía Antonia no había nacido?

Sí señor.

Entonces eso fue como cuanto tiempo después de usted volver a Salinas a casa de su padre dio a luz a Antonia?

Di a luz quince ó 20 días a Antonia. Estuve poco tiempo con él.

¿Usted estuvo allí el año 26 hasta poco antes del mes de septiembre?

Sí señor.

¿Entónces volvió?

A casa de mi papá.

¿Usted estaba allí en el Callejón Comercio, en las habitaciones que alquiló?

Sí señor."

. . . . . . .

Más adelante vuelve a preguntarle:

"¿A quién le tenían ustedes alquiladas, si recuerda, las habitaciones o dos cuartos que tenían alquilados en el Callejón Comercio?

No me recuerdo de quién era porque él fue quien las alquiló."

Cuando declaró el padre de la demandante se le pregunta que con quién había vivido su hija y él contesta que "el que la sacó de allá de Salinas para acá fue Arturo Valdejully, que se la trajo para Ponce". (Pág. 194 T. de E.)

Esta prueba demuestra que Valdejully, hombre soltero conoce a Felícita Dávila, también soltera de quince años en Salinas. La enamora y sostienen relaciones íntimas, y cuando Valdejully se traslada a Ponce se la lleva a vivir a unas habitaciones que alquila en la mencionada ciudad. A pregunta del abogado de los demandados de si Valdejully vivía allí durante todas las noches, Felícita contesta que sí. Manifiesta también que Valdejully tenía una habitación en un hotel donde guardaba su ropa, pero a la pregunta del abogado de los de-

mandados de si iba por allí o vivía, contesta "nosotros vivíamos allí". Es significativo que en esta etapa del contrainterrogatorio el abogado de la parte demandada le advirtió a la testigo sobre la importancia de aclarar y establecer si Valdejully "iba por allí o vivía". Es entonces que Felícita afirma que vivía allá. Evidentemente el abogado de los demandados estaba consciente de que la prueba podía señalar la existencia de un estado de concubinato. Cuando la joven sale encinta y Valdejully tiene que ausentarse para los Estados Unidos en viaje de negocios la deja en la casa de los padres de ésta en Salinas, pero le entrega el dinero para sufragar los gastos del alumbramiento. Cuando Valdejully regresa de Estados Unidos terminó definitivamente sus relaciones con la madre de la demandante. Si bien el juez de instancia al formular sus determinaciones de hecho afirma que Valdejully visitaba frecuentemente a Felícita Dávila, madre de la demandante, lo cierto es que la prueba en la que basó su determinación, y la única que hubo sobre este extremo, establece que Valdejully iba todas las noches a dormir a casa de Felícita, pues, no puede dársele otro alcance al testimonio de ésta en el contrainterrogatorio. Así entendemos que es el significado de la determinación de hecho del juez de instancia.

 Esta situación de hechos claramente establece un estado de concubinato de acuerdo con la norma establecida por nuestras decisiones. En *Sánchez* v. *Díaz*, 78 D.P.R. 811 (1955) expresamos a la página 814 que:

". . . Repetidamente hemos dicho que el concubinato a que alude el inciso 3 del artículo 125 del Código Civil—31 L.P.R.A. sec. 504—se refiere a la condición de vivir juntos un hombre y una mujer como marido y mujer sin estar realmente casados. *López* v. *Rodríguez*, 68 D.P.R. 756; *Bianchi* v. *Sucn. Bianchi*, 67 D.P.R. 594; *Montañez* v. *Rodríguez*, 67 D.P.R. 214."

Que Felícita Dávila y Valdejully vivían como marido y mujer lo deja establecido la prueba no contradicha a la cual le dio crédito el juez de instancia. Ambos eran solteros; Valdejully lleva a Felícita de Salinas a Ponce donde la instala en unas

habitaciones que alquiló en el Callejón Comercio de aquella ciudad y todas las noches iba dormir a este sitio. El hecho de que Valdejully mantuviera un cuarto en un hotel donde guardaba su ropa en forma alguna altera la situación que apuntamos. En *Estela* v. *Sucn. Medraño*, 51 D.P.R. 548 (1937) expresamos a la página 549 que: "[e]ste tribunal nunca ha dicho que el concubinato no puede coexistir con la tenencia de una morada separada o de una morada separada ostensible donde el amante guarda su ropa y su cama . . .". Y más adelante dijimos a la página 553 que: "[a]l igual que en el caso de Sucesión de Bird la corte consideraba la existencia de una residencia separada meramente como circunstancia que tenía que ver con la cuestión de concubinato *vel non* al igual que hubiera considerado cualquier otra circunstancia que hubiera podido ser de importancia en relación con dicho punto. El caso no sirve de autoridad para la contención de que el tener una residencia separada es incompatible con la existencia de un estado de concubinato. Si pudiera considerarse como autoridad para tal contención entonces, hasta ese extremo, debe resolverse que ha sido revocada por el caso de *Góñez* v. *Palmieri*, 50 D.P.R. 457". Tampoco altera la situación el hecho de que al momento del alumbramiento no estuviera la madre de la demandante viviendo en Ponce con Valdejully. La prueba demostró, según lo determinó el tribunal de instancia, que Felícita quedó encinta estando viviendo con Valdejully y que no fue hasta que éste tuvo que ausentarse para los Estados Unidos en viaje de negocios que volvió a Salinas, pero Valdejully le entregó dinero suficiente para sufragar sus gastos, demostrativo de que la situación de concubinato llegó hasta el nacimiento de la demandante. Su viaje a los Estados Unidos no puede tener el efecto de truncar las relaciones existentes. En *Estela* v. *Sucn. Medraño*, 44 D.P.R. 149 (1932) establecimos que el hecho de que el padre muriera antes del nacimiento del hijo en forma alguna impedía la aplicación del precepto que exige que el concubinato subsiste al momento del nacimiento del hijo. De igual forma la

partida de Valdejully para los Estados Unidos en viaje de negocios habiendo llevado él mismo a Felícita a Salinas y haciéndole entrega del dinero para sufragar los gastos del alumbramiento no puede considerarse como que tuvo el efecto de terminar las relaciones existentes entre Valdejully y la madre de la demandante.

■ En un estudio de reciente fecha sobre la materia que estudiamos, Calderón, *La Filiación en Puerto Rico*, 21 Rev.C. Abo. P. R. 275 (1961), se expresa a la página 287:

"En resumen, de lo anterior podemos derivar las siguientes conclusiones:

1. El concubinato podía existir aunque el hombre y la mujer no vivieran juntos permanentemente;

2. El mero hecho de tener una querida y visitarla ocasionalmente no bastaba para dejar establecida la relación de concubinato. Era menester que **entre el hombre y la mujer existiera** una relación cuasimarital de relativa permanencia, una relación que aunque no idéntica al matrimonio, fuera más fuerte y definida que aquélla en que un hombre meramente mantiene una querida."

A lo anterior debemos expresar que la relativa permanencia a que se alude en el artículo citado no tiene que ir más allá de lo que el propio artículo 125 dispone, o sea, durante el embarazo y al tiempo del nacimiento del hijo. Si las relaciones que establecen el concubinato perduran durante el tiempo que requiera el código, se cumple con el requisito requerido. Obviamente en el caso de autos las relaciones concubinarias perduraron durante el tiempo requerido por el estatuto.

■ Es pertinente repetir aquí lo que expresamos en *Colón* v. *Sucn. A. J. Tristani*, 44 D.P.R. 171, 207 (1932) "[s]ería injusta una ley que una vez demostrado que hay un padre, no facilitase los medios de obligarle a asumir las responsabilidades contraídas con el hijo que engendró. Ese no pudo ser el pensamiento del legislador; ése no puede ser el espíritu de las disposiciones del artículo 193 [125 ed. 1930] del Código Civil".

Como la sentencia debe dictarse teniendo por base lo probado y no necesariamente lo alegado y las determinaciones de hecho formuladas por el tribunal de instancia, así como la prueba presentada, establecen que la madre de la demandante y el causante de los demandados vivieron en concubinato durante el embarazo y al tiempo del nacimiento de la demandante, procede que se revoque la sentencia recurrida y se declare con lugar la demanda de filiación interpuesta en el caso de autos.

*Se revocará la sentencia recurrida dictada por el Tribunal Superior, Sala de Ponce, con fecha 6 de agosto de 1957 y se dictará otra declarando a la demandante Antonia Dávila, hija natural reconocida de Arturo E. Valdejully. Se devolverá el caso para ulteriores procedimientos.*