259 F.2d 33
 MASSACHUSETTS BONDING AND INSURANCE COMPANY and United States of America, Claimants-Appellants,
v.
STATE OF NEW YORK, Claimant-Appellee.
In re FAGO CONSTRUCTION CORPORATION, Bankrupt.
 No. 337.
 Docket 25032.
 United States Court of Appeals Second Circuit.
 Argued May 12, 1958.
 Decided July 11, 1958.
 
 Mark N. Turner, of Brown, Kelly, Turner & Symons, Buffalo, N. Y. (Raymond C. Vaughan, Buffalo, N. Y., on the brief), for claimant-appellant Massachusetts Bonding & Insurance Co.
 George F. Lynch, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and I. Henry Kutz, Attys., Dept. of Justice, Washington, D. C., and John O. Henderson, U. S. Atty., W.D.N.Y., and John C. Broughton, Asst. U. S. Atty., Buffalo, N. Y., on the brief), for claimant-appellant United States.
 Ruth Kessler Toch, Asst. Atty. Gen. of State of New York, Albany, N. Y. (Louis J. Lefkowitz, Atty. Gen. of State of New York, and Paxton Blair, Sol. Gen., New York City, and Michael P. Geraci, Asst. Atty. Gen., Buffalo, N. Y., on the brief), for State of New York, claimant-appellee.
 Before CLARK, Chief Judge, and SWAN and LUMBARD, Circuit Judges.
 CLARK, Chief Judge.
 
 
 1
 This is an appeal in a bankruptcy proceeding in which the parties contest their relative priorities to some $41,000 now left in the bankrupt's estate. Involved are claims of the United States for unpaid withholding, social security, and unemployment taxes, claims of the State of New York for unpaid franchise, motor fuel, and unemployment insurance taxes, and two claims of Massachusetts Bonding and Insurance Company, a surety on two contracts performed in part by the bankrupt.
 
 
 2
 A petition for adjudication of bankruptcy was filed against Fago Construction Corporation on March 31, 1949, and it was adjudicated a bankrupt on the same day. Prior to bankruptcy, on May 15, 1947, the bankrupt had entered into a contract with the United States for the construction of a flood control project at Bath, New York, at a contract price of $417,860. In compliance with the Miller Act, 40 U.S.C. §§ 270a et seq., it furnished two bonds to the United States — one guaranteeing performance and the other securing the payment of laborers and materialmen. On both bonds Massachusetts Bonding and Insurance Company was the surety pursuant to the bankrupt's applications, in which, as consideration for the bond, it inter alia assigned to the surety, effective upon its default under the contract with the United States, all deferred payments or retained percentages, and any and all moneys and properties that might be due and payable at the time of claim or default, or that might become due and payable to the bankrupt in connection with the contract. And in August 1947, the bankrupt made a similar arrangement with the surety in connection with another contract with the United States for work on a Veterans Hospital in Buffalo, New York.
 
 
 3
 The record shows that in April 1948, the bankrupt informed the surety that it was in trouble financially and needed the surety's assistance to proceed with the Bath and Buffalo jobs. As a result of this, the surety presented a program to assure completion of the projects and the bankrupt gave the surety a collateral chattel mortgage on its equipment. In addition Dominick S. Fago, the bankrupt's principal shareholder and president, gave the surety a collateral mortgage on certain real property which he owned. Under the surety's program the bankrupt executed a letter of authority addressed to the United States Engineers directing that all checks due on the Bath project be sent to J. Herbert Crafts, the surety's attorney. In addition the bankrupt executed a Treasury form power of attorney authorizing Crafts to receive, endorse, and collect checks in its name drawn on the Treasurer of the United States. The surety and the bankrupt then opened a joint bank account in which the surety deposited substantial sums of its own money and certain checks of the United States for estimates on the Bath job. The bankrupt agreed that all such proceeds would be deposited in that account, which was used to pay labor and material bills on the two projects.
 
 
 4
 During the course of this arrangement the bankrupt, in breach of its agreement, sought to collect a check from the United States for some $41,000 due on the Bath job. The surety brought an action to attach the check and eventually was successful in collecting those proceeds. Massachusetts Bonding & Insurance Co. v. Fago Construction Corp., D.C.Md., 82 F.Supp. 619. On another estimate check on the Bath job, however, the surety was less successful, for Fago, after improperly revoking the bankrupt's instructions to the United States Engineers to mail checks due on the Bath job to Crafts, succeeded in securing $25,893 due on that job which he deposited in the bankrupt's own account. The record shows that immediately afterwards Fago withdrew $18,000 of these proceeds, which he put in his own personal account. Of this he used $9,500 to purchase a tract of land in the name of another of his corporations. This $9,500, plus interest, eventually was recovered by the trustee and is now part of the assets in the bankrupt's estate.
 
 
 5
 Well prior to the adjudication, the bankrupt became delinquent in the payment of federal withholding and social security taxes. Between January 1947 and September 1948, the Commissioner of Internal Revenue received assessment lists on these taxes which, with interest and penalties, aggregated $51,868.41. He duly filed notices of these deficiencies in December 1948 and January 1949. The United States then set this sum off against a progress payment otherwise due to the bankrupt on the Bath job, and a certificate releasing the lien was filed.
 
 
 6
 The relevant claims filed in this proceeding disclose the following: The United States claims $31,166.40 for social security, unemployment, and withholding taxes for the years 1947 and 1948. The State of New York claims $8,829.77 for franchise, motor fuel, and unemployment insurance taxes for the years 1947, 1948, and 1949. The surety claims for unrecompensed expenditures of over $136,000 on the two projects $51,868.41 as a subrogee to the tax liens of the United States which were satisfied by the setoff and $9,500 as the equitable owner of the proceeds recovered by the trustee which were used by Dominick S. Fago to purchase land for another of his corporations. The referee ruled that the surety became subrogated to the satisfied tax liens and awarded it all the assets of the bankrupt, less administration expenses and the New York franchise taxes. The district court affirmed the referee with regard to the administration expenses and franchise taxes, but accorded third priority to the tax claims of the United States and the remaining tax claims of the State of New York, and fourth priority to the surety's claims. From this judgment both the surety and the United States appeal. The surety argues in substance that the referee's decision was proper. The United States contends that New York was improperly afforded priority on its claim for franchise taxes and that the United States is entitled to priority over New York to the extent of $5,757.41. We proceed to the surety's appeal first.
 
 
 7
 * The surety contends that it is entitled to be subrogated to the position of the United States in relation to the latter's liens for taxes with interest and penalties of $51,868.41, which were satisfied prior to bankruptcy by setoff against money earned by the bankrupt on the Bath job. Basic, of course, to this contention is that the surety paid the tax, or, in the context of this case, owned the funds against which the setoff was made. But the surety cannot establish this fact, for under the doctrine of United States v. Munsey Trust Co. of Washington, D. C., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022, neither the bankrupt nor the surety ever became entitled to these funds, so that there was nothing for the surety to own. In short, the surety by way of subrogation might be entitled to progress payments and retained percentages due its principal if the surety completes the job after the principal's default. See, e. g., Henningsen v. U. S. Fidelity & Guaranty Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547; Prairie State Nat. Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; American Surety Co. of N. Y. v. Sampsell, 327 U.S. 269, 69 S.Ct. 571, 90 L.Ed. 663. See also annotations at 45 A.L.R. 379, 134 A.L.R. 738, and 164 A.L.R. 613. But this right relates only to funds otherwise due to the principal. United States Fidelity & Guaranty Co. v. Triborough Bridge Authority, 297 N.Y. 31, 74 N.E.2d 226. Where, as here, the funds never became payable because of the creditor's right to a setoff for other debts, the surety never owned or became entitled to the funds and hence cannot be subrogated to the position of the creditor who made the setoff.
 
 II
 
 8
 The surety also claims that $9,500 in the hands of the trustee belongs to it, and not to the bankrupt's estate. These funds were part of the progress payment of $25,893 made to the bankrupt after the surety commenced supervising the bankrupt's operations. Prior to the bankruptcy the surety instituted an action against Fago and the bankrupt to impress a lien on the real estate purchased with part of the payment and for conversion of the remainder, alleging that the payment belonged to it. The bankruptcy intervened and the action against the bankrupt (now represented by the trustee) was severed. The action against Fago came to trial and resulted in a judgment in favor of the surety for the full amount of the progress payment. This judgment remains unsatisfied. The trustee then instituted an action to impress a lien on the real property purchased with the $9,500. This was settled, and the trustee received a general mortgage on the property which has now been satisfied by payment of $9,500.
 
 
 9
 The surety's position below and here is that it was entitled to the payment in question which was converted by Fago and the bankrupt. It urges that the trustee recovered the proceeds of the real estate mortgage impressed with a trust in its favor and that the estate now contains at least $9,500 belonging to it. The referee declined to rule on the surety's claim because he found that the surety was otherwise entitled to the major portion of the assets in the estate as a subrogee to the satisfied tax liens of the United States. Therefore he never reached the question which the district court thought necessary to decide, viz., whether the bankrupt, in addition to Fago, converted the payment in question. Thus the district court refused to rule that the $9,500 belonged to the surety because of the failure of the referee to find that the bankrupt converted the payment.
 
 
 10
 We believe that a finding of conversion is unnecessary to entitle the surety to the $9,500 and that on familiar principles of subrogation the surety has a prior claim to this sum which the record clearly shows represents a traceable portion of a payment made by the United States to the bankrupt under the construction contract which was completed by the surety. It is settled law that a surety which undertakes to complete a construction contract after its principal has defaulted and pays laborers and materialmen becomes entitled to payments due the principal from the owner, here the United States, independent of any formal assignment.[1] Prairie State Nat. Bank of Chicago v. United States, supra, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412; Henningsen v. U. S. Fidelity & Guaranty Co., supra, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547. This right to "first" priority attaches not only to moneys due the principal at the time of default, but to so-called "unearned" moneys which arise from the surety's activities in completing the contract after the principal's default. Arrow Iron Works v. Greene, 260 N.Y. 330, 183 N.E. 515; Maryland Casualty Co. v. Board of Water Com'rs of City of Dunkirk, 2 Cir., 66 F.2d 730, certiorari denied 290 U.S. 702, 54 S.Ct. 346, 78 L.Ed. 603. Of course the surety's rights might be defeated if the payment is received by the principal, who then pays it to another of his creditors who is unaware of the surety's rights. See, e. g., California Bank v. U. S. Fidelity & Guaranty Co., 9 Cir., 129 F.2d 751. But if the payment is still in the hands of the principal, its trustee in bankruptcy, or a stakeholder, the surety's rights are superior even to those of formal assignees of the proceeds of the contract, for its rights arise at the time of the making of the surety contract. Henningsen v. U. S. Fidelity & Guaranty Co., supra, 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547; Prairie State Nat. Bank of Chicago v. United States, supra, 164 U. S. 227, 17 S.Ct. 142, 41 L.Ed. 412; In re Scofield Co., 2 Cir., 215 F. 45; In re P. McGarry & Son, 7 Cir., 240 F. 400.
 
 
 11
 The questions here are whether the bankrupt defaulted so as to bring into operation the rights of the surety, and if so, whether these rights to payments from the owner take priority over tax claims of the State of New York and the United States. Both the State and the United States vehemently argue that the default contemplated in the contract between the bankrupt and the surety never occurred, and hence the assignment never matured; nor did the surety acquire a lien by way of subrogation. To some extent the arrangement created by the bankrupt and the surety whereby construction costs were paid out of the joint account into which they deposited progress payments supports this argument, for nominally the bankrupt continued its operations subject only to financial supervision by the surety. In this way construction activity never ceased and bills were paid without material delay. But to analyze these facts so as to deprive the surety of its claim based on subrogation when it actually provided over $136,000 of its own money to pay laborers and materialmen is too technical to warrant serious consideration. Cf. Century Cement Mfg. Co. v. Fiore, 264 App.Div. 475, 36 N.Y.S. 2d 332. The nub of the bankrupt's default was its inability to continue paying its bills. Whether the surety stepped in prior to or after the bankrupt failed to pay these bills is of little moment. The important fact is that the surety expended large sums of its own money to complete the contracts for which it has not been recompensed.
 
 
 12
 The trustee in bankruptcy acted upon this state of facts in at least two instances, thereby recognizing the surety's rights to payments from the United States on the contracts. After bankruptcy and after the Bath and Buffalo jobs were completed and accepted, the United States paid to the trustee the final balances due of $8,800 and $3,501.05 respectively which he paid over to the surety. Neither the United States nor the State of New York has taken exception to payments, as well they could not, for, as we have stated, the payments due from the United States after the surety entered the scene were due the surety as a subrogee. The only difference between these sums and the $9,500 here at issue is the ease with which they can be identified as payments on the construction contracts. But the record clearly shows, and neither the United States nor the State of New York contends otherwise, that the $9,500 is a traceable portion of a payment made by the United States on the Bath job. In fact if there was a contrary finding below we would have to reverse it as clearly erroneous.
 
 
 13
 The remaining question on this aspect of the case is whether the surety's claim as a subrogee takes precedence over the tax claims. This identical issue was treated in a well reasoned opinion by Fuld, J., in United States Fidelity & Guaranty Co. v. Triborough Bridge Authority, supra, 297 N.Y. 31, 74 N.E.2d 226, where the Court of Appeals of New York determined that a surety's claim was entitled to priority over a claim of the United States on a lien for unpaid taxes filed after the making of the surety contract, but before payments by the surety on account of the principal's default. The court there concluded that the surety became subrogated to the owner's rights against the principal and that the surety's "equity" became available and enforceable when it carried out the contract's provisions, thus resulting in a "lien" which arose prior to the tax liens. This is in accord with the federal authorities cited above. And the case at bar is even stronger than the New York case, for here the surety carried out the contract provisions, i. e., paid laborers and materialmen, before the filing of the tax liens in question. Moreover, had Fago desisted from improperly securing the payment in question, it would have been used to pay some of the costs of the projects, thereby reducing the surety's loss; and it would not have been available to satisfy the tax claims in issue. Now that a portion of that payment is in the hands of the trustee, equitable considerations demand that it be applied to the surety's claim.
 
 III
 
 14
 The contest between the United States and the State of New York involves two issues: whether or not the State's claim for franchise taxes became a lien entitling it to a priority status superior to that afforded tax claims under § 64, sub. a(4), of the Bankruptcy Act, 11 U.S.C. § 104, sub. a(4); and whether or not the United States procured a similar lien on the bankrupt's property for certain unpaid withholding and social security taxes under the Internal Revenue Code of 1939, §§ 3670, 3671.
 
 
 15
 Under § 213, sub. 2, of the N. Y. Tax Law, corporate franchise taxes become a lien on the real and personal property of a corporation on the date the corporation is required by § 211, sub. 1, to file its franchise tax report or return. The latter section required the bankrupt to file its returns for each fiscal year on the 15th of May following the close of such fiscal year, but it does not appear from the record that the bankrupt complied with this filing requirement for its fiscal years 1947 (return due May 15, 1948) or 1948 (return due May 15, 1949). Nor does it appear that the State, prior to the bankruptcy, assessed the taxes it now claims or issued warrants to enforce its statutory liens. Clearly the presumed failure of the bankrupt to file the required returns is immaterial, for the statute, § 213, sub. 2, plainly says that the tax becomes a lien "on the date on which the report is required to be filed." But the question arises whether the State's lien for these taxes was sufficiently perfected prior to bankruptcy to gain precedence over the tax claims of the United States.
 
 
 16
 We are dealing here only with the franchise taxes due for the bankrupt's fiscal year 1947, for its returns for the years 1948 and 1949 were not required to be filed until after the adjudication and hence no statutory liens, inchoate or otherwise, could have arisen within the prescribed time for taxes due for the latter years. Bankruptcy Act, § 67, sub. b, 11 U.S.C. § 107, sub. b.
 
 
 17
 The United States argues that the State's lien, although perhaps effective against various classes of private creditors in some types of action, see, e. g., In re Century Steel Co. of America, 2 Cir., 17 F.2d 78; Engelhardt v. Alvino Realty Co., 248 N.Y. 374, 162 N.E. 287, is too imperfect or inchoate to operate so as to deprive the United States of its alleged lien priority or general priority under the Bankruptcy Act § 64, sub. a(4), 11 U.S.C. § 104, sub. a(4). It cites numerous cases in support of this position, especially People of State of New York v. Maclay, 288 U.S. 290, 292, 53 S. Ct. 323, 324, 77 L.Ed. 754, which involved a contest between New York, claiming lien priority under the forerunner to the present franchise tax section, and the United States, which claimed priority under § 3466 of the Revised Statutes, 31 U.S.C. § 191. In that case the State presented a claim for franchise taxes against the receivers of an insolvent corporation. But the taxes had not been assessed or liquidated until after the appointment of the receivers and the Court sustained the priority of the United States on the ground that the State's lien was "not so perfected or specific as to change the rule of distribution" of the statute. Although the priority created by 31 U.S.C. § 191 has no effect in a bankruptcy proceeding instituted under § 59 of the Bankruptcy Act, 11 U.S.C. § 95, the same principles announced in those cases where the statute was relevant apply to the issue whether the lien claimed by New York is specific enough to be effective against the competing federal claim. United States v. Security Trust & Sav. Bank of San Diego, 340 U.S. 47, 71 S.Ct. 111, 95 L.Ed. 53; United States v. City of New Britain, 347 U.S. 81, 74 S.Ct. 367, 98 L.Ed. 520. See 4 Collier on Bankruptcy 265 (14th Ed. 1942); but cf. United States v. Sampsell, 9 Cir., 153 F.2d 731. Under the doctrine of those cases it is evident that here the State obtained merely a general or inchoate lien which was not sufficiently perfected to warrant priority over the tax claims of the United States. State Tax Commission v. Union General Corp., 208 Misc. 133, 144 N.Y.S.2d 75; Smith v. Meader Pen Corp., 255 App.Div. 397, 8 N.Y.S.2d 39, affirmed 280 N.Y. 554, 20 N.E.2d 13; People of State of New York v. Maclay, supra, 288 U.S. 290, 53 S.Ct. 323, 77 L.Ed. 754.
 
 IV
 
 18
 The second aspect of the contest between the State of New York and the United States involves the issue whether the United States has a lien on the assets in the estate, and therefore priority over the State's claims, for a portion of the taxes due it. It now appears that assessment lists were received by the Commissioner of Internal Revenue showing that social security and withholding taxes in the amount of $5,757.41 (including assessed interest) were assessed against the bankrupt prior to the adjudication. Under §§ 3670 and 3671 of the Internal Revenue Code of 1939, this resulted in perfected liens in favor of the United States to the extent of these taxes which arose prior to the bankruptcy, and thus are enforceable as priority claims under § 67, sub. b, of the Bankruptcy Act, 11 U.S.C. § 107, sub. b.
 
 
 19
 On this issue the United States is met with the contention that it waived or lost its claim by failing to assert it before the referee or the district court. It appears from the record that this "lien theory" was never urged below. It is also clear, however, that the formal claim presented in the proceeding by the United States, and other portions of the record, contained sufficient facts to sustain the lien and the priority. Thus the uncontested claim of the United States showed that the bankrupt owed it social security taxes for the quarter ending December 1948, together with interest which began to run on March 9, 1949, and withholding taxes for the quarters ending December 1947 and 1948, together with interest which commenced to run on November 22, 1948, and February 28, 1949, respectively. Obviously the interest could not begin to accrue until after the taxes were assessed and until after the local collector received from the Commissioner of Internal Revenue the assessment lists in question. Internal Revenue Code of 1939, § 3655. In addition the United States appended to its brief in this court the actual certificates of assessment.
 
 
 20
 Of course it is always desirable to urge to the district court the legal theories upon which a party claims decision. But as Rule 54(c), F.R.Civ.Proc., points out, it is the court's responsibility to award relief required by the facts on any proper ground, regardless of the theories urged by the parties. Thus on numerous occasions, as noted in the margin,[2] we, as well as other courts, have granted relief on legal theories not presented by the parties to the district court. In fact in a recent case similar to this one, the Supreme Court affirmed a recovery by the United States on a "lien theory" never urged to the district court. United States v. Bess, 357 U.S. 51, 78 S.Ct. 1054, 2 L.Ed.2d 1135. Here we have such a situation; after careful consideration it is evident to us that the United States showed sufficient facts to warrant priority for its claim.
 
 
 21
 The distribution of the bankrupt's assets, therefore, should proceed with the payment of administration expenses, including proper counsel fees, and the sum of $9,500 to Massachusetts Bonding and Insurance Company, followed by the payment of $5,757.41 to the United States for taxes owed by the bankrupt which were secured by liens perfected prior to the adjudication, and then by the pro rata payment of all other taxes claimed by the United States and the State of New York, including franchise taxes. All other claims are necessarily postponed.
 
 
 22
 Order reversed and proceeding remanded for the entry of a decree as directed in this opinion.
 
 
 
 Notes:
 
 
 [1]
 We do not reach a consideration of the effect of the assignment executed by the bankrupt in favor of the surety. That issue raises difficult questions under the Anti-Assignment Act, 31 U.S.C. § 203, which are unnecessary to answer here
 
 
 [2]
 See, e. g., Columbia Research Corp. v. Schaffer, 2 Cir., 256 F.2d 677; Vibra Brush Corp. v. Schaffer, 2 Cir., 256 F.2d 681; Joint Council Dining Car Emp. Local 370, Hotel and Restaurant Emp. International Alliance v. Delaware, L. & W. R. Co., 2 Cir., 157 F.2d 417, 420; Hormel v. Helvering, 312 U.S. 552, 61 S.Ct. 719, 85 L.Ed. 1037; Trop v. Dulles, 356 U.S. 86, 78 S.Ct. 590, 2 L.Ed.2d 630, reversing 2 Cir., 239 F.2d 527