**MORRISON ASSURANCE COMPANY, INC.**

v.

**The UNITED STATES.**

**No. 195–81T.**

United States Claims Court.

Oct. 27, 1983.

DeWitte Thompson, Atlanta, Ga., for plaintiff.

William B. Barker, Washington, D.C., with whom was Asst. Atty. Gen., Glenn L. Archer, Jr., Washington, D.C., for defendant; Donald H. Olson, and Theodore D. Peyser, Washington, D.C., of counsel.

## OPINION

LYDON, Judge:

Plaintiff, a surety company, had underwritten Miller Act bonds on a National Park Service (Park Service) construction contract with Consolidated Building Corporation (CBC) pursuant to 40 U.S.C. § 270a (1976). In this action plaintiff seeks to recover $30,119.15, representing the final contract payment, which the Park Service withheld from it and paid over to the Internal Revenue Service (IRS) pursuant to a tax levy issued by the IRS. The IRS had levied on the unpaid contract proceeds, which were otherwise due plaintiff, because CBC had a Federal tax deficiency of $30,-119.15.

Plaintiff claims that, under the circumstances of this case, the Park Service was not entitled to setoff CBC's tax liability from contract proceeds otherwise due and owing plaintiff since completion of the contract in question was due solely to plaintiff's actions as a completing surety under its performance bond. Defendant disputes plaintiff's contention that it was a completing surety, and further argues that even assuming plaintiff to be a *de facto* completing surety, plaintiff was not a *de jure* completing surety since there was no formal default of the contractor which would serve to give rise to a formal takeover of contract performance by the surety in accordance with Federal Procurement Regulations (FPR), 41 C.F.R. §§ 1–18.803–1 to 1–18.-803–5, 1–18.803–6(c) (1979).

Following trial, and after consideration of the submissions of the parties, it is concluded on the basis of the particular facts in this case, that plaintiff should be deemed to have completed the project as a completing surety and that the expenses incurred after it took over the contract were incurred under its performance bond. Consequently, plaintiff is entitled to the full amount of the contract proceeds free from any setoff for the contractor's tax liabilities.

### I.

On September 28, 1978, CBC contracted with the Park Service to perform renovation and construction work at the Cumberland Island National Seashore in Georgia for the contract price of $172,907. Under the terms of the contract between CBC and the Park Service, the Park Service agreed to pay CBC with a series of earned progress payments. The Park Service retained 10 percent of the progress payments due until satisfactory completion of the project.[1]

On October 20, 1978, plaintiff issued to CBC a payment bond and a performance bond for the Cumberland Island project. Plaintiff's liability limit on the payment bond was $86,453.50, and its liability limit on the performance bond was $172,907. These bonds named plaintiff as surety, CBC

---

1. Detailed findings of fact which are part of this opinion, although they are not attached hereto, have been provided the parties. Only those facts necessary to place the issue for decision in proper perspective have been set forth and discussed in the opinion.

as principal, and the Park Service as obligee.

Prior to this time, on April 30, 1978, plaintiff and CBC had entered into a General Agreement of Indemnity. This agreement applied to all present and future CBC construction projects bonded by plaintiff, and therefore it included the Cumberland Island project. The agreement defined plaintiff's indemnity rights with respect to construction bonds underwritten by plaintiff for CBC's bonded projects. This agreement listed certain conditions which would serve to put CBC in default on the construction bonds. Two separate conditions of default listed in the agreement were: (1) "[if] Principal fails to pay for any labor or materials when due," and (2) "[if] any obligee declares Principal to be in default." The agreement further provided that in the event of CBC's default, plaintiff could take over any of CBC's bonded contracts and arrange for that project's completion.

In February 1979, CBC began work on the Cumberland Island project. The project involved construction and historical renovation work on two structures at the Cumberland Island National Seashore, namely, the Captain's House and the Carpenter's Shop. CBC's performance on the project thereafter proceeded in a fashion satisfactory to the Park Service.

About May 1979, plaintiff received several notices that CBC had failed to pay some suppliers and subcontractors on certain jobs bonded by plaintiff. None of these subcontractors or suppliers were on the Cumberland Island project. Plaintiff then began an initial investigation into CBC's financial status. This initial investigation was conducted by plaintiff's managing general agent.

As a result of CBC's poor financial status, which this initial investigation disclosed, plaintiff hired a certified public accountant to conduct a more thorough investigation into CBC's financial state. The accountant's investigation disclosed that CBC had serious financial problems. Among CBC's liabilities was an amount of $51,406.72 which CBC owed in delinquent state and Federal taxes, and another $10,089 which CBC owed in penalties for nonpayment of said taxes. Included in this tax delinquent amount was $24,216.23 which CBC owed the IRS for delinquent payroll taxes. The Federal payroll taxes were delinquent because CBC had deducted the amounts from the paychecks of its employees and then failed to deposit the amount with the IRS as required by law.

Essentially, plaintiff's investigation into CBC's financial status disclosed that CBC was currently operating only by nonpayment and/or delay in payment of its financial obligations. As a result, on the surface CBC's contract performance gave no indication to the Park Service of CBC's precarious financial situation. Because of CBC's failure to pay some of its suppliers and subcontractors and its tax obligations, as of May 1979, plaintiff was in default on its April 30, 1978, indemnity agreement with plaintiff. On May 31, 1979, plaintiff sent a letter to the Park Service instructing it to stop all payments to CBC on the Cumberland Island contract. The Park Service at that time stopped all payments to CBC for work done in the Cumberland Island project. As of that date, the Park Service had paid some $52,900 to CBC on its contract.

In June 1979, CBC stopped work on the Cumberland Island project. Ostensibly, this work stoppage was a result of CBC's inability to procure the proper grade of shingle for the Cumberland Island project. However, there was work which CBC could have performed without the shingles, and, moreover, CBC stopped work on all its government projects bonded by plaintiff after plaintiff froze the contract payments on each of them.

On or about July 17, 1979, plaintiff sent the Park Service a notice stating that all the proceeds of the Cumberland Island project were assigned to itself. The notice also stated that no monies were to be paid to CBC without the notification and consent of plaintiff. The Park Service accepted the assignment without determining whether CBC accepted it.

CBC, in fact, contested the assignment and sent a letter to the Park Service on July 27, 1979, which disputed the assignment and claimed it to be invalid. The letter also stated that CBC would hold the Park Service liable for any amounts paid to plaintiff under the assignment. On August 3, 1979, CBC took the further step of bringing suit in a federal district court against plaintiff and the Park Service. The suit alleged that the assignment of proceeds asserted by plaintiff was unlawful and invalid.

Meanwhile, during June and July 1979, plaintiff took action to curtail its liability on the government construction projects which it bonded for CBC. Sometime in June or July 1979, plaintiff advised Leon Spear (Spear), CBC's president and majority stockholder, that it was considering taking over CBC's government construction projects which it bonded. To that end, plaintiff solicited bids from another contractor for completion of the various projects. Based upon this contractor's bids, plaintiff determined that it would be less expensive to utilize, if possible, CBC to complete the projects.

During the summer of 1979, plaintiff held discussions with the IRS concerning CBC's tax liabilities. At one such meeting in July 1979, plaintiff and the IRS representative discussed the fact that CBC would be able to pay future and delinquent taxes only if it were allowed to remain in business. In light of this consideration, the IRS agreed to refrain from collection activities, and it further agreed to allow CBC to remain in business. As a result of the discussions at these meetings, plaintiff paid the IRS $1,500 for CBC's tax liabilities on projects bonded by it.

On August 9, 1979, the IRS filed a notice of a Federal tax lien against CBC with respect to the unpaid employment tax liability for the fourth quarter of 1978 and the first quarter of 1979 in the respective amounts of $18,561.93 and $15,244.30. The IRS, however, did not force CBC out of business by attempting to execute on the tax lien.

In August 1979, plaintiff and CBC attempted to resolve their differences relative to CBC's construction projects bonded by plaintiff. To that end, plaintiff and CBC entered into an agreement on August 21, 1979, to which the Park Service was not a party. This agreement stated that "CBC will use its laborers, subcontractors, and suppliers to complete each of the aforesaid construction projects [the Cumberland Island project was one of the projects] and Morrison agrees not to directly or indirectly interfere with CBC's performance of its contract."

In addition, the August 21st agreement defined the role of CBC and plaintiff in the completion of the Cumberland Island project, *inter alia*. Under the agreement, CBC agreed to submit regular requests for payment to the Park Service. Plaintiff agreed to pay CBC's suppliers, subcontractors and laborers. The agreed method of payment was for CBC to submit completed invoices from suppliers and subcontractors, and plaintiff then was to pay the suppliers and subcontractors directly. Plaintiff also agreed to pay other expenses, *e.g.*, workmen's compensation expenses and state and Federal taxes associated with the projects.

The August 21st agreement also provided that plaintiff was to receive all proceeds of the Cumberland Island contract including those earned by CBC prior to the agreement but retained by the Park Service. Further, CBC agreed to dismiss without prejudice its suit filed against plaintiff and the Park Service. Finally, CBC agreed to give plaintiff 50 percent of any amount CBC might receive as additional compensation relative to claims for additional work on the Cumberland Island contract which CBC submitted or intended to submit to the Park Service.

On August 24, 1979, plaintiff and the Park Service entered into an agreement with respect to the Cumberland Island contract to which CBC was not a party. Under this agreement plaintiff agreed to be primarily responsible for the completion of the Cumberland Island project. Specifically, the agreement stated, "[i]n further consid-

eration of the payments made by the United States to Morrison under said contract CX 50081583 and the surety bond pertaining thereto, Morrison agrees that it or its contractor will complete the work in accordance with the time schedules of said contract in a manner satisfactory to the United States."

Also under the August 24th agreement, plaintiff agreed to hold the United States harmless from any expense which the United States might incur as a result of a successful claim by CBC that the Park Service wrongfully paid plaintiff the Cumberland Island contract proceeds. The United States, in turn, agreed to pay to plaintiff all amounts due under the Cumberland Island contract, including amounts earned by CBC prior to August 24, 1979, but retained by the Park Service.

At no time prior to or at the time of, the August 24th agreement did the IRS inform plaintiff that it would levy on the Cumberland Island contract proceeds in order to satisfy CBC's tax liabilities set forth in the tax lien discussed previously. In fact, plaintiff entered into the August 24th agreement under the impression that it would receive the entire amount due it under the Cumberland Island contract.

The project was restarted in August 1979. CBC performed the construction work. CBC ordered most of the materials used on the job and, in accordance with the August 21st agreement, submitted the invoices to plaintiff. Plaintiff then paid the suppliers directly. Plaintiff also paid CBC's weekly payroll by depositing in an account, an amount equal to the amount needed to meet the payroll. CBC then drew from that account to pay its labor force. Plaintiff directly withheld and deposited the taxes due on CBC's weekly payroll and paid the same to IRS when due, and also paid all necessary insurance expenses on the project.

Plaintiff also paid CBC's subcontractors directly. In addition, in at least two instances, plaintiff contracted directly with the subcontractors. One of the subcontractors with whom plaintiff contracted directly had a prior subcontract with CBC. CBC had failed to pay this subcontractor, and the subcontractor had to apply for payment to plaintiff as plaintiff was the surety for CBC's payment bond on that project. Because of this prior experience with CBC, this subcontractor refused to deal with CBC and contracted directly with plaintiff.

Throughout the entire course of the project, the Park Service considered CBC to be the prime contractor. The Park Service's contracting officer did not consider the August 24th agreement to be a takeover agreement because CBC was not in default on the contract. The fact that CBC continued to perform the construction work with little immediate supervision by plaintiff reinforced the Park Service's belief.

The Cumberland Island project was completed in April 1980. The IRS levied on the contract proceeds in the Park Service's possession on April 25, 1980. The Park Service informed plaintiff by letter dated April 30, 1980, that the final payment of $36,186.68 would not be paid. Instead, the letter stated that $30,119.15 was to be paid to the IRS to satisfy its levy and that the balance of $6,067.53 was to be paid to plaintiff. Plaintiff then wrote a letter to the Park Service disputing the withholding of $30,119.15 for CBC's tax liability.

Plaintiff paid out $191,000 in completing the work on the Cumberland Island contract. Approximately $17,000 of the $191,000 amount was paid under plaintiff's payment bond for expenses incurred on the Cumberland Island project prior to plaintiff's takeover of the contract. The Park Service paid plaintiff $120,000, but withheld $30,119.15 in satisfaction of CBC's tax liability. As a result, plaintiff received only $89,880.85 for completing the Cumberland Island contract.

## II.

Plaintiff's contention is that at the time of the August 24, 1979, agreement between plaintiff and the Park Service, plaintiff took over the Cumberland Island contract as completing surety. As such, plaintiff

argues, all the expenses it incurred in the completion of the project were paid under its performance bond obligation, and it is therefore entitled to all contract proceeds free from setoff for CBC's tax liabilities.

The government counters plaintiff's contentions with two arguments. First, the government maintains that plaintiff did not, in fact, take over the Cumberland Island contract because it failed to provide explicitly for such a takeover in the August 24th agreement with the Park Service. In addition, the government contends that plaintiff did not assume control of the project to effect such a takeover. Second, the government maintains that plaintiff failed to follow the procedure for surety takeovers provided in the Federal Procurement Regulations, 41 C.F.R. § 1–18.803 (1979). The government argues that this failure to follow the applicable regulations deprives plaintiff of its right to claim the status of a completing surety and, thus, receive the contract proceeds free from any setoff.

The first step in determining plaintiff's entitlement to the contract proceeds at issue is to analyze the role plaintiff played in the completion of the project. A consideration of plaintiff's role in the completion of the Cumberland Island contract sheds light on the important question of whether plaintiff incurred the costs of completion under its performance bond obligation or under its payment bond obligation.

▮▮▮ The distinction between a payment bond obligation and a performance bond obligation is crucial to the outcome of this case. The government is entitled to setoff the tax debt of the contractor against retained contract proceeds claimed by the surety under its payment bond. *United States v. Munsey Trust Co.,* 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947); *United States Fidelity & Guaranty Co. v. United States,* 201 Ct.Cl. 1, 12, 475 F.2d 1377, 1383 (1973). When the surety pays construction expenses under its performance bond obligation, it receives the contract proceeds free from setoff by the government because the surety receives the

proceeds as subrogee of the government as well as the contractor. *Trinity Universal Ins. Co. v. United States,* 382 F.2d 317 (5th Cir.1967), *cert. denied,* 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968); *Security Ins. Co. v. United States,* 192 Ct.Cl. 754, 428 F.2d 838 (1970). Clearly, plaintiff here can avoid setoff of CBC's tax liabilities only if it took over performance of the Cumberland Island contract and, therefore, paid the completion expenses under its performance bond obligation.

▮▮▮ A performance bond obligates the surety to complete an unfinished construction project. Under the terms of the performance bond, the surety becomes the responsible party for the completion of the contract if the original contractor is unable to complete it. As such, the performance bond protects the government by making sure that it is not left with a partially completed project because of an insolvent contractor. *See United States v. Ardelt-Horn Constr. Co.,* 446 F.2d 820 (8th Cir. 1971) *cert. denied,* 404 U.S. 1060, 92 S.Ct. 740, 30 L.Ed.2d 747 (1972). A payment bond, on the other hand, protects the subcontractors, the materialmen, and the laborers. It is under the payment bond that the subcontractors, materialmen and laborers are assured of payment. They look first to the prime contractor for payment. If, however, the prime contractor fails to pay any of them, then the surety is obligated to pay them.

▮▮▮ Essentially, the payment bond and the performance bond are distinguished by the different obligations a surety has under the respective bonds. Under the performance bond, the surety must assume primary responsibility for the completion of the contract. Under the Federal Procurement Regulations, the surety has the option of completing the project itself or allowing the government to find a new contractor and pay the government the expense of completion. *See* 41 C.F.R. § 1–18.803–6 (1979). Under either method, however, the surety is responsible for the expense of completion up to the applicable bond limit. Under the payment bond, the surety is responsible for

certain unsatisfied debts of its bonded contractor and has no responsibility for the completion of the project. Although the actual expenses paid under each bond may often be similar, the surety has primary responsibility for the project itself only under its performance bond.

In the present case, there was no formal default by the contractor on the contract at issue. Here the contractor was in default on its indemnity agreement with plaintiff. CBC had failed to pay several subcontractors and suppliers; a condition which constituted default under the terms of the indemnity agreement which CBC and plaintiff signed on April 30, 1980.

CBC's failure to pay its subcontractors, and suppliers triggered an investigation by plaintiff into CBC's finances. The investigation made it clear that CBC was in such dire financial condition that default on all its bonded jobs was inevitable. Plaintiff then took action to ensure that it would be protected in the event of a default; these actions included the freezing of contract proceeds on CBC's projects bonded by plaintiff and the subsequent notification to the obligee of assignment of the proceeds of the Cumberland Island contract rights, *inter alia.*

Plaintiff's claim that it took over the Cumberland Island contract as completing surety is based upon both the August 21, 1979, agreement with CBC and the August 24, 1979, agreement with the Park Service. Under the August 21st agreement with CBC, plaintiff took over financial control of the Cumberland Island project. CBC remained on the job to perform the actual on-site work. Under the August 24th agreement between plaintiff and the Park Service, the Park Service agreed to pay the contract proceeds from the Cumberland Island contract to plaintiff, and plaintiff held the Park Service harmless on any claims by CBC for such payments. More importantly, as discussed below, plaintiff agreed to as-

sume primary responsibility for the completion of the Cumberland Island contract.

One difficulty with construing the August 21st and August 24th agreements as constituting a takeover by plaintiff of the Cumberland Island project is that the contracting officer did not interpret the August 24th agreement as a takeover agreement. Instead, the contracting officer considered the August 24th agreement to be a formalization of CBC's assignment to plaintiff of the Cumberland Island contract proceeds. In fact, during the course of contract performance, the contracting officer testified, he considered CBC to be the prime contractor since plaintiff never explicitly told him, either at the time of the August 24th agreement, or thereafter, that it was "taking over" the project.[2]

The contracting officer's interpretation of the August 21st and August 24th agreements is not determinative of the real nature of these agreements. Instead, it is necessary to look at the plain language of the agreements and the conduct of the parties subsequent thereto. Only after such an examination can a conclusion be made on the issue of whether plaintiff, in fact, took over the Cumberland Island project after the August 24th agreement.

The August 21st agreement with CBC gave plaintiff complete financial control over the Cumberland Island project, while CBC carried out the on-site construction work. Under the August 24th agreement with the Park Service, plaintiff assumed primary responsibility for the completion of the Cumberland Island project. The August 24th agreement stated: "Morrison agrees that it or its contractor will complete the work in accordance with the time schedules of said contract in a manner satisfactory to the United States." The contracting officer's interpretation notwithstanding, the August 24th agreement between plaintiff and the Park Service changed plaintiff's responsibility for the project. Under

---

**2.** The contracting officer testified that he thought that the August 24th agreement between the Park Service and plaintiff was collateral to the August 21st agreement between

CBC and plaintiff. The contracting officer considered the basic purpose of the August 24th agreement to be a limitation of the Park Service's liability for its payments to plaintiff.

**634**

its performance bond, plaintiff had only contingent responsibility; that is plaintiff was responsible for performing on its bond only if CBC, the principal, failed to perform. After the August 24th agreement, plaintiff's contingent responsibility relative to the project changed to primary responsibility.

Also, plaintiff's actions subsequent to the August 24th agreement were consistent with its new position of being primarily responsible for completion of the contract. Plaintiff paid the subcontractors and materialmen directly. It contracted directly with at least two subcontractors. Plaintiff also paid all labor costs, taxes, and insurance expenses related to the project.

■ The fact that plaintiff used CBC as its contractor to complete the project is not, under the circumstances, inconsistent with the conclusion reached herein that plaintiff in fact took over completion of the Cumberland Island contract. As the court stated in *Aetna Casualty and Surety Co. v. United States*, 435 F.2d 1082 (5th Cir.1970):

> [W]hether the surety entered a specific agreement with the *Government* to complete the contract * * * or made such an agreement with the defaulting *contractor,* as here, is immaterial. The applicable rule was stated in *Trinity* [*Trinity Universal Insurance Company v. United States*, 382 F.2d 317 (5th Cir.1967] at 320: ' * * * The Surety who undertakes to complete the project is entitled to the funds in the hands of the government not as a creditor and subject to set off, but as a subrogee having the same rights to the funds as the government.' [Id. at 1083 (citations omitted) (emphasis in original).]

■ Moreover, the fact that plaintiff had a limited role in the on-site construction work was consistent with its role as completing surety. In *Massachusetts Bonding & Ins. Co. v. New York*, 259 F.2d 33 (2d Cir.1958), the court held that the surety in that case was entitled to the status of completing surety when that surety's role involved only financial supervision over a bankrupt contractor who was never formerly defaulted by the government. In so

holding, the court stated "to analyze these facts so as to deprive the surety of its claim based on subrogation when it actually provided $136,000 of its own money to pay laborers and materialmen is too technical to warrant serious consideration." *Id.* at 37–38. In this case, plaintiff's role was greater than financial supervision. The fact that plaintiff left the on-site performance and supervision to the contractor who was experienced in such matters is just as inconsequential in this case as it was in *Massachusetts Bonding & Ins. Co. v. New York, supra.*

Finally, the government's argument fails to account for the fact that plaintiff greatly exceeded its liability limit on its payment bond in the course of completing the Cumberland Island project. Plaintiff's liability limit on the payment bond was $86,453.50. It spent approximately $174,000 to complete the project. Certainly, if plaintiff was making the payments to laborers, subcontractors, and materialmen under its payment bond, then it would have stopped such payments when it reached its liability limit. Since the amount plaintiff spent to complete the project is almost exactly plaintiff's total liability under its performance bond, it is not unreasonable to assign some weight to this fact in determining whether plaintiff should be deemed to be a completing surety.

Considering the August 21st and August 24th agreements, plaintiff's vital role in the completion of the project and the dire financial condition of the contractor at the time which made default on the part of the contractor inevitable unless the surety acted, it is reasonable to conclude that plaintiff did, in fact, take over the Cumberland Island project on August 24, 1979. To hold otherwise would require overlooking the essential fact that CBC was only the instrument with which plaintiff discharged its primary responsibility for completion of the project.

■ Defendant contends that even if the court determines that plaintiff, in fact, took over the Cumberland Island contract,

the government is still entitled to setoff CBC's tax deficiency from the contract proceeds. Defendant argues that Federal Procurement Regulations (FPR) required the Park Service to terminate CBC according to the procedure stated in the regulations before plaintiff could take over as completing surety. Since the Park Service never formally terminated CBC, defendant contends that the applicable regulations were not followed, and that as a matter of law, plaintiff's factually established takeover of the project was invalid. Defendant relies on FPR 41 C.F.R. § 1–18.803 (1979) in support of its contention.

Section 1–18.803 of the FPRs covers default terminations of fixed price construction contracts. Defendant's basic contention is that a surety cannot be deemed a completing surety unless the contractor is defaulted in accordance with the procedures set forth in section 1–18.803. It is conceded that the Park Service did not formally terminate CBC's contract. Accordingly, section 1–18.803 was not for application. The real question is whether section 1–18.803, or any other applicable regulation, precludes a surety from being deemed a completing surety in circumstances where the surety's financial activities precluded a contractor's inevitable default and certain termination action by the government and directly resulted in completion of a contract in a manner which protected the interests of the contractor, the surety and the government. It is concluded that this question must be answered in the negative.

A reasonable reading of section 1–18.803 does not *in haec verba* preclude a surety from being considered a completing surety merely because the government does not formalistically terminate the contractor. Defendant attempts to persuade otherwise by reference to section 1.18.803–6(c) which reads in pertinent part:

Because of the possibility of conflicting claims to unpaid prior earnings (retained percentages or amounts representing unpaid progress estimates) of the defaulting contractor, the surety may condition its offer of completion upon the execution by the Government of a 'takeover' agreement fixing the surety's rights to payment from such funds. In that event, the contracting officer may in his discretion (but not before the effective date of termination) enter into a written agreement with the surety.

Defendant extracts from the above quote the conclusion that takeover agreements may not be entered with the surety prior to the effective date of the termination of the contract. From this, defendant concludes that without a termination of the contract there can be no takeover of a contract, and thus there can be no completing surety. Such a conclusion is erroneous and results from a failure to read the entire language of the section in question. It is to be noted that section 1–18.803–6(c) deals with the situation in which a "surety *may* condition its offer of completion upon the execution by the Government of a 'takeover' agreement * * *." Implicit in this statement is the realization that a surety may take over completion of a contract without the execution of any takeover agreement by the Government. The fact that there is no takeover agreement does not mean that a surety cannot be deemed a completing surety if it otherwise qualifies for such status. The point is that defendant attempts to apply the regulations to a situation to which they are not applicable. There is no evidence that the surety in this case conditioned its offer of completion upon the execution by the government of a takeover agreement. Hence, section 1–18.803–6(c) has no relevance to the facts of this case.[3]

3. Even if one were to conclude that section 1–18.803–6(c) was applicable, it would not be unreasonable to construe the August 24th agreement between the plaintiff and the Park Service as a waiver by the government of strict compliance with the termination provisions of section 1–18.803. In certain instances, government procurement officials can waive statutory and/or regulatory rights. *See Bank of California National Ass'n v. Commissioner*, 133 F.2d 428, 433 (9th Cir.1943); *California Bank v. United States Fidelity & Guaranty Co.*, 129 F.2d 751, 752–53 (9th Cir.1942), (assignment of claims requirements). The facts at hand would support a waiver approach to recovery by plaintiff.

Assuming, *arguendo,* the applicability of section 1–18.803, the facts in this case comport favorably with the intent, purpose, and spirit of said section. Defendant cites section 1–18.803–6 and section 1–18.803–5(a) as balancing the rights among the government, the contractor and the surety. In this case, the agreements of August 21st and August 24th certainly accomplish this result. Defendant cites section 1–18.803–6(b) as enabling the government to protect itself from an incompetent or unqualified contractor which a surety might propose to use. Again, the agreements of August 21st and August 24th fully protected the government's interests by keeping a technically qualified but financially troubled contractor on the job until the contract was completed. Defendant cites section 1–18.803–6(c) as encouraging the inclusion of the contractor in the takeover agreement so that claims for prior earnings and retainages can be resolved. The August 21st agreement precluded any claims for earnings and retainages and thus satisfied the purpose of this section. Defendant cites section 1–18.803–6(c) as "requiring" that a takeover agreement specify that the surety will complete the work in accordance with the terms and conditions of the contract and that the surety will be paid the contract proceeds, but not in excess of the surety's cost and expenses. The August 24th agreement comports favorably with the requirements of this section. Despite the fact that there was no formal termination of CBC's contract, plaintiff's takeover of contract completion under the August 21st and August 24th agreements meets the thrust and intendment of section 1–18.803 that the interests of the contractor, the surety and the government be considered and attended to.

In essence, defendant's argument is premised upon the assumption that section 1–18.803 and its various subsections provide the only method by which a surety can take over a contract, and therefore failure to comply with the regulation's procedures invalids a surety's takeover of a project for purposes of government setoffs. The language of this section, however, is permissive. It states that a surety *may* take over a contract by means of a written agreement with the contracting officer. The use of the permissive verb "may" makes clear that a surety can validly take over a government construction project even if there is no written agreement with the contracting officer. Since a surety takeover can be valid without a written agreement, it is logical that a written agreement, which fails to conform precisely with the regulation's guidelines for written agreements can also be valid under certain circumstances.

This is not to say, of course, that the mere assertion by a surety that it took over a project will always be sufficient to constitute a valid takeover. When a takeover of a project is asserted and the procedural guidelines in section 1–18.803 are not followed, the specific facts and circumstances involved must be carefully scrutinized. Allowing such nonconforming takeover agreements creates the possibility of collusion between the surety and its contractor in order to allow the parties to receive the contract proceeds free from setoff for delinquent taxes. To counter this danger, the court must carefully examine each surety takeover situation to make sure that the purpose, intendment and rationale of the regulations has been met.

Analysis of defendant's argument that the plaintiff's takeover of the contract at issue is invalid indicates it rests on, at best, minor violations of procurement regulations, which violations, if such they be, did not prejudice or harm the government or the contractor.

This court's predecessor, the United States Court of Claims, has held that harmless violations of procurement regulations do not *ipso facto* invalid the termination process. In *Philadelphia Regent Builders, Inc. v. United States,* 225 Ct.Cl. 234, 634 F.2d 569 (1980), the contracting officer's termination notice failed to contain all the information required by the regulations. In upholding the validity of the termination notice, the court emphasized the lack of harm to the plaintiff and, therefore, refused "[t]o nullify this termination for default solely on the grounds of these technical

defects * * *." *Id* 225 Ct.Cl. at 239, 634 F.2d at 573. *See also John Reiner & Co. v. United States,* 163 Ct.Cl. 381, 393, 325 F.2d 438, 444 (1963). (Failure to follow Armed Service Procurement Regulations does not convert termination into breach unless contractor can show injury.) *See generally American Farm Lines v. Black Ball Freight Service,* 397 U.S. 532, 538–539, 90 S.Ct. 1288, 1292–1293, 25 L.Ed.2d 547 (1970).

In this case, it is not the contractor asserting the procedural violation, but the government. Yet, here no injury resulted to any of the parties to the contract because of plaintiff's failure to have CBC terminated before taking over the contract. The Park Service, in fact, received a benefit from the method by which plaintiff took-over the contract. By foreseeing CBC's default and preventing a formal default by CBC on the Cumberland Island contract, plaintiff minimized delay in completion of the project. If plaintiff had waited for CBC to formally default, which event was most probable if the surety had not acted, the Park Service may well have had to endure the delays inherent in the process of procuring a new contractor and waiting for that contractor to become familiar with the project. In addition, by keeping CBC on the job, plaintiff ensured that the work would be done by a contractor satisfactory to the Park Service.

Further, plaintiff protected the Park Service from the possibility of a suit by CBC against the Park Service for wrongful payment of the contract proceeds. Both the "hold harmless" clause of the August 24th agreement between plaintiff and the Park Service and CBC's relinquishment of the contract proceeds in the August 21st agreement between CBC and plaintiff ensured the Park Service's protection. Thus, there was no possibility of conflicting claims "to unpaid prior earnings (retained percentages or amounts representing unpaid progress estimates)", the evil that section 1–18.803–6(c) relied on by defendant was designed to protect the government from.

Moreover, CBC did not need the protection of the termination procedures in the regulations. CBC relinquished its right to payment of the contract proceeds in its August 21st agreement with plaintiff. CBC also relinquished all control over the project's finances under the August 21st agreement. This was the critical takeover by plaintiff that ensured contract completion. Therefore, CBC suffered no injury because it was not formally terminated pursuant to the termination regulations. CBC's role as contractor had already been spelled out in the August 21st agreement with plaintiff.

Finally, there is no evidence of collusion between CBC and plaintiff in order to avoid the payment of Federal employment taxes. This case is not one of the surety and contractor attempting to circumvent the tax laws. Instead, it is a case of an alert surety acting to further both its own interest and those of the obligee by assuming responsibility for a project without waiting for the inevitable and most probable default of the bonded contractor if no action were taken. Given the facts and circumstances of this case, it is clear the purpose of the regulations under discussion are not subverted by a validation of plaintiff's takeover of the Cumberland Island contract. Therefore, plaintiff's takeover of the project is deemed valid even if it is assumed that there was a technical failure to follow section 1–18.803–6(c) of the FPRs concerning surety takeover agreements.

Defendant's interpretation of the surety takeover provision of the FPR's, *i.e.,* section 1–18.803–6(c), on the facts of this case, even if conceded *arguendo* to be a correct literal interpretation of the regulation's language, does not, in the court's view, come within the spirit or intent of the regulations. "[A] thing may be within the letter of the statute [or regulation] and yet not within the statute, because not within its spirit, nor within the intention of its makers." *Church of Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 512, 36 L.Ed. 226 (1892).

The purpose of section 1–18.803–6(c) is to eliminate disputes over claims to retained percentages earned by the contractor prior

to the surety's takeover. The first sentence of the subsection clearly sets forth this purpose: "Because of the possibility of conflicting claims to unpaid prior earnings * * * of the defaulting contractor, the surety may condition its offer of takeover upon execution by the government of a written takeover agreement." Given the safeguards of the August 21st and August 24th agreements, the Park Service faced no real possibility of a dispute over retained earned payments. Further, as discussed above, CBC did not need the procedural protection provided by the termination provision. To invalidate plaintiff's takeover because of a failure to follow exactly the technical requirements of the takeover regulation (as interpreted by defendant) is to elevate form over substance. Therefore, under the principle of *Church of Holy Trinity v. United States, supra,* it is reasonable and proper to consider plaintiff a completing surety even if defendant's interpretation of the regulation is accepted.[4]

### III.

Plaintiff claims it is entitled to interest on the $30,119.15 withheld from it. It is well established that interest is not allowed on a claim against the government unless authorized by statute or a provision in a contract. *L'Enfant Plaza Properties, Inc. v. United States,* 3 Cl.Ct. 582 at 592 (Cl. Ct. 1983) (MAYER, J.). *Brookfield Constr. Co. v. United States,* 228 Ct.Cl. 551, 559, 661 F.2d 159, 165 (1981); *First National City Bank v. United States,* 212 Ct.Cl. 357, 371, 548 F.2d 928 (1977) (en banc), 28 U.S.C. § 2516(a) (1976). Here the contract contained no applicable interest provision; consequently plaintiff has belatedly asserted its interest claim under the interest provi-

sion of the Contract Disputes Act (CDA), 41 U.S.C. § 611 (Supp. V 1981).

Plaintiff's contract claim, however, is not cognizable under the CDA, and thus plaintiff cannot assert a claim for interest under that act. Since the Cumberland Island contract was entered into prior to the effective date of the CDA, March 1, 1979, plaintiff's claim can come under the CDA only if it made a proper election to come under the CDA, 41 U.S.C. § 601 (note) (Supp. V 1981). *See Brookfield Constr. Co. v. United States, supra,* 228 Ct.Cl. at 554, 661 F.2d at 162.

Plaintiff, however, made no such election. Indeed, plaintiff in its complaint did not allege jurisdiction under the CDA. Plaintiff's attempt to bring its complaint within the provisions of the CDA is really a belated attempt to take advantage of the CDA's interest provision. Plaintiff, however, is in no position to take advantage of the provision of the Act.

It is settled that this court has no jurisdiction over claims under the CDA unless the contracting officer has rendered a final decision in the matter. *Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 177, 645 F.2d 966, 967 (1981). Here there was no final decision by the contracting officer on plaintiff's claim.

### CONCLUSION

For reasons set forth above, plaintiff is entitled to recover, with judgment to be entered for plaintiff for $30,119.15. Plaintiff is not entitled to recover interest on this amount.

---

**4.** Defendant initially contended that any recovery by plaintiff was subject to offset for CBC's tax liability on the Cumberland Island contract under 40 U.S.C. 270a(d) (1976) and IRC § 3505 (1976). However, in its post-trial brief defendant withdrew this offset defense. As indicated in the findings of fact which accompany this opinion, it is impossible on this record to determine if any of the tax deficiency of $30,119.15

reflects withholding taxes attributable to the Cumberland Island contract. This fact ostensibly underscores defendant's withdrawal of this defense. Further, plaintiff concedes, as it must, that this court has no jurisdiction over its alternative causes of action sounding in tort. Plaintiff disavows any theory of recovery based on tort.