**SECURITY INSURANCE COMPANY
OF HARTFORD**

v.

**The UNITED STATES.**

No. 2–67.

United States Court of Claims.

July 15, 1970.

Thomas Penfield Jackson, Washington, D. C., attorney of record, for plaintiff. Thomas S. Jackson, and Jackson, Gray & Laskey, Washington, D. C., of counsel.

Ira Mark Bloom, Dept. of Justice, Washington, D. C., with whom was Asst.

Atty. Gen., Johnnie M. Walters, for defendant. Philip R. Miller and Joseph Kovner, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S AND DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT

COWEN, Chief Judge.

This case concerns the extent to which the Government may set off taxes owed to it by a defaulting contractor against retainages claimed by a Miller Act[1] surety who completes the contract pursuant to its performance bond. The case comes before the court on cross-motions for summary judgment.

For the purposes of this motion, the following agreed and stipulated facts are pertinent: On or about October 31, 1962, the New Amsterdam Casualty Company [hereinafter "surety"] executed and delivered payment and performance bonds on a contract entered into on October 31, 1962, by the Flagg Construction Company [hereinafter "contractor"] and the Army Corps of Engineers (Contract No. DA 08–123 Eng 4696). The contract called for the construction of an enlisted men's barracks at Fort Allen, Puerto Rico. The August 11, 1963, completion date specified in the contract was later extended to September 10, 1963.

Plaintiff Security Insurance Company is successor by merger to the New Amsterdam Casualty Company.[2]

The surety obtained personal indemnity agreements from Norman G. Flagg and his wife, Caroline, who were officers and principal shareholders of Flagg Construction Company. From April 1962 to January 1963, the surety issued bonds to the contractor on four other construction contracts, including one with the Corps of Engineers for another project at Fort Allen, Puerto Rico.

By October 31, 1963, the contractor had not completed work on the barracks contract, or on the other project at Fort Allen. On December 10, 1963, the surety requested that the Corps of Engineers make no further payments to the contractor in view of the notices of claims the surety had received from laborers and materialmen. On December 11, 1963, the Corps of Engineers advised the surety that the work on the barracks contract was 99 percent complete as of December 1, 1963. Norman Flagg informed the surety on December 13, 1963, that liquidated damages were accruing at the rate of $60 per day on the two Fort Allen contracts.

Although the contractor's right to proceed with the barracks was never formally terminated, the surety took over completion of the barracks contract on February 1, 1964. The Corps of Engineers accepted the barracks as complete on February 7, 1964, stopping the accrual of liquidated damages, although the work was not actually completed until at least March 3, 1964.

The original contract price for the barracks of $100,162 was later reduced by change orders to $97,497.20. The Gov-

---

1. Act of August 24, 1935, c. 642, 49 Stat. 793, 40 U.S.C. 270a–e (1964), as amended, (Supp. IV, 1965–68). The Miller Act, to the extent here pertinent, provides:

"(a) Before any contract, exceeding $2,000 in amount, for the construction, alteration, or repair of any public building or public work of the United States is awarded to any person, such person shall furnish to the United States the following bonds, which shall become binding upon the award of the contract to such persons, who is hereinafter designated as 'contractor':

"(1) A performance bond with a surety or sureties satisfactory to the officer awarding such contract, and in such amount as he shall deem adequate, for the protection of the United States.

"(2) A payment bond with a surety or sureties satisfactory to such officer for the protection of all persons supplying labor and material in the prosecution of the work provided for in said contract for the use of each such person. * * * "

2. For convenience, plaintiff and "surety" will be referred to interchangeably.

ernment paid the contractor $79,790.44, and charged the contractor $5,250 in liquidated damages as the result of the delay in completion. There was then due and owing by the Government under the barracks contract $12,456.76, comprised of the following items:

$8,712.36—retained percentages from 10/31/62 to 10/31/63

$2,162.08—earnings from 11/1/63 to 1/31/64

$1,582.32—earnings from 2/1/64 to 2/7/64.

From the amount due under the barracks contract, the Government set off $9,764.08 for Federal taxes owed by the contractor. The contractor owed withholding, Federal Insurance Contribution Act (FICA), and Federal Unemployment Tax Act (FUTA) taxes, plus interest, in the total amount of $10,780.98 for 1962, 1963, and the first quarter of 1964.

On April 11, 1964, the contractor corporation was adjudicated bankrupt by the United States District Court for the District of New Hampshire. The Government recovered $95 on its tax claims, but the surety recovered nothing. On November 9, 1964, Caroline Flagg was adjudicated bankrupt by the same court. In the latter proceeding, the surety filed claims under the various indemnified payment and performance bonds it had issued to the contractor, including the payment and performance bonds on the barracks contract, and recovered $1,454.01.

Norman Flagg has not been adjudicated bankrupt. The record does not disclose what action, if any, the surety has taken regarding Norman Flagg's personal liability on the indemnity agreement.

In completing the work under the barracks contract and on the other Fort Allen project, the surety expended $11,970.43 for labor and materials, and $2,558.-

02 for attorney's services, for a total expenditure of $14,528.45. The surety also expended other sums in the settlement of the claims of laborers and materialmen arising prior to the surety's taking over the work on the barracks.[3]

Plaintiff here sues to recover the $12,456.76 in accumulated retainages under the barracks contract, free from setoff for the contractor's indebtedness to the United States. Relying on the interpretation given United States v. Munsey Trust Co., 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947), by the Fifth Circuit Court of Appeals in Trinity Universal Ins. Co. v. United States, 382 F.2d 317 (5th Cir. 1967), cert. denied, 390 U.S. 906, 88 S.Ct. 820, 19 L.Ed.2d 873 (1968), plaintiff asks the court to reexamine its early decision in Standard Accident Ins. Co. v. United States, 97 F. Supp. 829, 119 Ct.Cl. 749 (1951), wherein the court, on the basis of *Munsey*, held that the Government was entitled to set off against the retainages claimed by a performance bond surety on a Government contract, the tax debt of the contractor to the United States. Plaintiff maintains, and *Trinity, supra,* holds that the rule permitting set off, as enunciated by the Supreme Court in *Munsey,* was intended to be applied only against a payment bond surety (the *Munsey* facts), and not against a performance bond surety who completes the contract.

The defendant, on the other hand, contends that *Standard Accident* was correctly decided and that the *Munsey* rule should be applied to suits both by payment and performance bond sureties. Further, the defendant contends that plaintiff is not entitled to the $2,162.08 earned by, but not paid to, the contractor prior to the date plaintiff took over performance of the barracks contract. The defendant concedes, however, that plaintiff is entitled to recover its earnings

---

3. As will be noted hereinafter, plaintiff is entitled to recover from the accumulated retainages under Contract No. DA 08-123 Eng 4696 (the barracks contract), free from setoff, only the amount it ex-

pended in completing the contract pursuant to the performance bond. This amount has not been stipulated and will therefore have to be determined by the trial commissioner on remand.

in the amount of $1,582.32 under the contract after it took over performance (February 1, 1964).[4]

██ We have carefully reviewed the *Munsey* decision to determine its application to the facts in the case at bar. We have also considered the trend manifested in the cases decided and the governmental regulations promulgated since *Munsey* and *Standard Accident* were handed down. As a result, we have concluded that the *Munsey* rule was intended to apply and, in justice to the surety and the Government, should only be applied in an action by a payment bond surety and not in a suit by a surety who completes performance of the contract pursuant to the surety's performance bond. To the extent, therefore, that *Standard Accident* holds otherwise, we overrule that decision.

## I

We consider first United States v. Munsey Trust Co., *supra*. In *Munsey*, the Supreme Court faced the hitherto undecided question of the rights *inter-sese* of the Government and a payment bond surety on a Government contract to retainages withheld by the Government pursuant to the contract.[5] The Court noted that the Government "has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him' ", 332 U.S. at 239, 67 S.Ct. at 1601, quoting Gratiot v. United States, 15 Pet. 336, 370, 10 L.Ed. 759 (1841). Accordingly, the Court held that the Government was entitled to set off against the retained funds otherwise payable to the surety, the indebtedness of the contractor to the Government under another and unrelated contract.

The Court rejected the surety's contention that it was subrogated to the rights of the laborers and materialmen it had paid pursuant to the payment bond, since the laborers and materialmen had no enforceable rights against the United States, 332 U.S. at 241, 67 S.Ct. 1599. Instead, the Court said that the surety was subrogated to the rights of the contractor, and, as subrogee of the contractor could not claim rights which the contractor did not have.

Significantly, however, from the standpoint of the instant case, the Court suggested, and we agree, that a different result would obtain in a suit by a surety on a performance bond, since in such a case, the surety, by electing to complete performance,[6] would have conferred a benefit on the Government by relieving it of the task of completing performance itself.

The Court stated:

Respondent [surety] argues that if the work had not been completed, and the surety chose not to complete it, the surety would be liable only for the amount necessary to complete, less the retained money. Moreover, if the surety did complete the job, it would be entitled to the retained moneys in addition to progress payments. The situation here is said to be similar. But *when a job is incomplete, the government must expend funds to get the work done, and is entitled to claim damages only in the amount of the excess which it pays for the job over what it would have paid had the contractor not defaulted. Therefore, a surety would rarely undertake to complete a job if it incurred the risk that by completing it might lose more than if it had allowed the government to proceed. When laborers and ma-*

---

4. *See* Massachusetts Bonding & Ins. Co. v. New York, 259 F.2d 33, 37 (2d Cir. 1958).

5. The retainage provisions of the instant contract were of the standard form in use at the time the contract was awarded, and may be found at 41 C.F.R. § 1–

16.901–23A (1962). *See* 32 C.F.R. § 16.401–1 (1961).

6. Performance bonds generally give the surety the option of taking over and completing performance or assuming liability for the obligee's (owner's) costs in excess of the contract price.

*terialmen, however, are unpaid and the work is complete, the government suffers no damage. The work has been done at the contract price.* The government cannot suffer damage because it is under no legal obligation to pay the laborers and materialmen. *In the case of the laborers' bond, the surety has promised that they will be paid, not as in the case of performance bond, that work will be done at a certain price. * * * [332 U.S. at 244, 67 S.Ct. at 1604 (Emphasis added)]*

Subsequent to *Munsey,* in Pearlman v. Reliance Ins. Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962), the Supreme Court held that *Munsey* left "undisturbed" the "established doctrine," as set forth by the Court in Prairie State National Bank of Chicago v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412 (1896), that "a surety who completes a contract has an 'equitable right' to indemnification out of a retained fund." 371 U.S. at 138, 141, 83 S.Ct. at 237. The Miller Act was also held not to have changed the law as declared in *Prairie Bank.* 371 U.S. at 139, 83 S.Ct. 232. *Pearlman,* however, was a suit to determine the priority in right to a retained fund of the surety on a Government contract and the trustee in bankruptcy of the contractor, and is thus factually distinguishable from the instant case.

Recently, in Trinity Universal Ins. Co. v. United States, *supra,* the Fifth Circuit Court of Appeals, relying on Munsey, similarly distinguished suits by sureties on Miller Act payment and performance bonds. The operative facts in *Trinity* closely parallel those of the instant case;[7] the determinative issue was the same. The court held:

* * * The rights of the surety in Munsey were those of a subrogee of the contractor. Whoever, be it the contractor or his surety, pays the laborers and the materialmen would be a creditor of the government insofar as the retained funds are concerned. *Pearlman,* 371 U.S. at p. 141, 83 S.Ct. 232 * * *. Of course, however, the government has a right to set off claims against its creditors.

*A different situation occurs when the surety completes the performance of a contract. The surety is not only a subrogee of the contractor, and therefore a creditor, but also a subrogee of the government and entitled to any rights the government has to the retained funds.* If the contractor fails to complete the job, the government can apply the retained funds and any remaining progress money to costs of completing the job. The surety is liable under the performance bond for any damage incurred by the government in completing the job. On the other hand, the surety may undertake to complete the job itself. In so doing, it performs a benefit for the government, and has a right to the retained funds and remaining progress money[8] to defray its costs. *The surety who undertakes to complete the project is entitled to the funds in the hands of the government not as a creditor and subject to set-off, but as a subrogee having the same rights to the funds as the government.* [382 F.2d at 320]

*Cf.* Guarantee Co. of North America v. Tandy & Allen Constr. Co., 76 N.J.Super. 274, 184 A.2d 426 (1962).

We need only add to the reasoning of the Fifth Circuit that it would defeat the purpose of the retainages—to assure

---

7. They differ only in that in *Trinity* the surety completed performance after having entered into a formal take-over agreement with the Government. As an alternative ground for relief, the court held that implicit in the take-over agreement, was the right of the surety to have

the full contract price applied to the completion of the work. 382 F.2d at 321.

8. It is clear from the court's opinion that "the remaining progress payments" referred to the amounts to be earned upon completion of the remaining work by the surety.

completion of the contract—to permit setoff against the claims of the completing performance bond surety.

## II

Finally, a no-setoff rule as applied to claims against retainages by performance bond sureties finds support in the regulations governing sureties on Government contracts. The provisions of the Federal Procurement Regulations and the Armed Services Procurement Regulations [9] are substantially identical. They provide that when the surety enters into an agreement with the contracting officer to take over completion of the work after default by the contractor, the take-over agreement shall include the following:

Dealings with surety—take over agreements.

\* \* \* The agreement shall provide that the surety will undertake to complete the work required by the contract in accordance with all the terms and conditions of the contract, and that the Government will pay the surety in the manner provided by the contract, but not in excess of the surety's costs and expenses, the balance of the contract price unpaid at the time of default; subject, however, to the following conditions:

(1) *Any unpaid earnings of the defaulting contractor, including retained percentages and progress estimates for work accomplished prior to termination, shall be subject to claims by the Government against the contractor, except to the extent that such unpaid earnings may be required to permit payment to the completing surety of its actual costs and expenses*

*incurred in the completion of the work, exclusive of its payments and obligations under the payment bond given in connection with the contract.* [32 C.F.R. § 18.618–5 (1970) (Emphasis added); *See* 41 C.F.R. § 1–18.-803–6 (1970)].

▌ The clear purport of these regulations is that setoff is permissible against the retained funds claimed by a payment bond surety (the *Munsey* situation). However, when a performance bond surety and the Government enter into a formal take-over agreement, a setoff is not to be permitted against the retained funds claimed by the performance bond surety. In the instant case it is stipulated that the surety and the government did not enter into a formal take-over agreement. Additionally, the pertinent ASPR provisions did not take effect until 1965,[10] after all of the events herein at issue. Nonetheless, we believe that the regulations are helpful in that they reflect the distinction which the Supreme Court in *Munsey* appears to have recognized, and we believe should be drawn, between claims against retainages by payment and performance bond sureties.[11]

Accordingly, for all of the reasons stated above, we hold that plaintiff is entitled to recover from the accumulated retainages under Contract No. DA 08–123 Eng 4696 (the barracks contract), the amount it expended in completing the contract pursuant to the performance bond, free from setoff for the indebtedness of the contractor to the United States. Plaintiff is also entitled to recover its earnings in the amount of $1,582.32 under Contract No. DA 08–123 Eng 4696 after February

---

9. The Federal Procurement Regulations cover the civilian, and the Armed Services Procurement Regulations cover the military departments. *See* 32 C.F.R. § 1.102 (1969); 41 C.F.R. § 1–1.004 (1970).

10. 30 Fed.Reg. 6019, 6028 (1965).

11. In view of the broad coverage now afforded by the Federal Procurement Reg-

ulations and the Armed Services Procurement Regulations, the issue presented in this case should rarely, if ever, arise again. The surety can protect its rights to the retained funds by complying with the regulations and entering into a take-over agreement with the Government's contracting officer.

1, 1964, the date it took over performance of the contract.

 Plaintiff is not entitled to recover from the accumulated retainages under Contract No. DA 08–123 Eng 4696, free from setoff, the amount it expended pursuant to the payment bond on the contract. *Munsey, supra.* Nor is plaintiff entitled to recover, free from setoff, any amount earned by, but not paid to, the contractor prior to the date plaintiff took over performance of the contract.[12] Since this is a suit to recover the retainages accumulated under Contract No. DA 08–123 Eng 4696, plaintiff is also not entitled to recover any amounts it may have expended pursuant to the payment or performance bonds on the contract for the other project at Fort Allen.[13]

We believe that this result is in accord with *Munsey*, and is consistent with the modern trend, as manifested in recent cases and the regulations. Moreover, it avoids the anomalous result whereby the performance bond surety, if setoff were permitted, would frequently be worse off for having undertaken to complete performance. As the Supreme Court noted in *Munsey*, "a surety would rarely undertake to complete a job if it incurred the risk that by completing it might lose more than if it had allowed the government to proceed." 332 U.S. at 244, 67 S.Ct. at 1604. *See Trinity, supra,* 382 F.2d at 321. We do not think that in enacting the Miller Act, the Congress intended such a result.

The case is remanded to the trial commissioner for the determination, in accordance with this opinion, of the amounts to which the plaintiff is entitled. Plaintiff's cross-motion for summary judgment is granted, and the defendant's motion for summary judgment is denied.

---

12. When a performance bond surety enters into a formal take-over agreement with the contracting officer under current regulations, the surety is entitled to, progress payments earned by but not paid to the contractor. However, the regulations were not in effect at the time the surety took over performance of the contract before us, and therefore there was no agreement entered into with the contracting officer. Accordingly, we follow *Massachusetts Bonding & Ins. Co.* and *Trinity Universal Ins. Co.* in allowing the Government to set off the tax debt of the contractor against the progress payment earned by the contractor before the surety took over performance of the contract.

13. In determining the amount of plaintiff's recovery, it will be necessary to ascertain whether the $2,558.02 expended by the surety "for its attorney's services" was a contract completion expense. Defendant suggests that there is also a question of the extent to which plaintiff has been indemnified for losses on the barracks contract by Caroline Flagg and Norman Flagg. If plaintiff has been indemnified for a part of its losses in completing the barracks contract, the amount of the indemnity received should be deducted from its claim against the Government in this action.