**The AETNA CASUALTY AND SURETY COMPANY, Plaintiff–Appellant,**

v.

**The UNITED STATES, Defendant–Appellee.**

**No. 87–1412.**

United States Court of Appeals, Federal Circuit.

April 25, 1988.

Adrian L. Bastianelli, III, Dempsey, Bastianelli, Brown & Touhey, Chartered, Washington, D.C., argued for plaintiff-appellant. With him on the brief was Donald A. Tobin.

Gordon D. Kromberg, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued for defendant-appellee. With him on the brief were Richard K. Willard, Asst. Atty. Gen. and David M. Cohen, Director.

Before MARKEY, Chief Judge, and NEWMAN and ARCHER, Circuit Judges.

ARCHER, Circuit Judge.

The Aetna Casualty and Surety Company (Aetna) appeals the judgment of the United States Claims Court, *The Aetna Casualty and Surety Co. v. United States*, 12 Cl.Ct. 271 (1987), denying its claim that it is entitled, as a performing surety, to retained funds on three construction contracts between the Naval Facilities Engineering Command (NAVFAC) and Mansfield Contracting Company (Mansfield) for which Aetna had issued payment and performance bonds. We reverse and remand.

I

The background facts involved are fully set forth in the Claims Court's opinion and will only be summarized here.

NAVFAC awarded three construction contracts to Mansfield: Contract No. N62477–79–C–0020 (OCS contract) for the construction of the OCS Complex Dining Facility, Quantico Marine Base, Quantico, Virginia; Contract No. N62477–79–C–0447 (EMO contract) for the renovation of, and addition to, the EMO Club, Naval Medical Command, Bethesda, Maryland; and Contract No. N62477–81–C–0118 (Fire Station contract) for the construction of a new fire station at the Quantico Marine Base, Quantico, Virginia. Aetna issued Miller Act, 40 U.S.C. § 270a, payment and performance bonds with respect to each of these contracts, naming Mansfield as principal and Aetna as surety.

On December 7, 1982, Mansfield informed Aetna that it was unable to meet its obligations under the contracts. Because of its bond obligations, Aetna began to fund Mansfield's operations relating to the contracts and so advised NAVFAC. On June 21, 1983, Aetna entered into a formal financing agreement with Mansfield in which it agreed to advance to Mansfield its costs on the bonded contracts. In September 1983, Mansfield advised Aetna that its future earnings under the three contracts would be sufficient to permit Mansfield to complete the work under the contracts. Aetna then stopped providing funds directly to Mansfield, but continued to make payments to subcontractors and suppliers.

When Mansfield fell behind schedule on all three projects, representatives of NAVFAC, Aetna and Mansfield met on a number of occasions. At these meetings, Mansfield's representative proposed new completion schedules. Aetna's representative stated that it would limit its activities to paying bills of subcontractors and suppliers, and declined NAVFAC's suggestion that it apply management or financial pressure on Mansfield to complete the projects. Aetna advised NAVFAC in writing on September 29, 1983, of the amounts that it had expended on the three contracts and requested that all funds still held by NAVFAC under the contracts be paid to Aetna. NAVFAC rejected this request.

Mansfield thereafter failed to comply with the new completion schedules. NAVFAC concluded that Mansfield was not capable of completing the projects and took beneficial occupancy of the OCS, EMO and Fire Station facilities in late 1983 and early 1984. For contract work that had not been completely finished, NAVFAC issued unilateral deductive change orders to each of the three contracts, reducing the contract prices.

On March 21, 1984, NAVFAC released to the Internal Revenue Service (IRS) $193,-559 of retained funds owed to Mansfield for work performed under the contracts, pursuant to a levy by the IRS for taxes owed by Mansfield. In a series of letters, Aetna objected to the release of contract funds to the IRS, but NAVFAC took the position that Aetna's rights as a surety did not entitle it to the funds transferred to the IRS. At the time of trial, NAVFAC still retained $30,053 under the OCS contract, $100,233 under the EMO contract, and $28,-216 under the Fire Station contract.

## II

Under a payment bond, a surety guarantees that subcontractors, laborers, and materialmen will be paid in the event of the principal's default. As stated in *Morrison Assurance Co., Inc. v. United States*, 3 Cl.Ct. 626, 632 (1983):

A payment bond ... protects the subcontractors, the materialmen, and the laborers.... They look first to the prime contractor for payment. If, however, the prime contractor fails to pay any of them, then the surety is obligated to pay them.

The payment bonds executed by Aetna provide that the surety's obligation shall be void and of no effect "if the Principal shall promptly make payments to all persons supplying labor and material in the prosecution of the work provided for in said contract."

Under a performance bond, on the other hand, the surety guarantees that a project will be completed in the event of the principal's default and that the Government will not have to pay more than the contract

price. *United States v. Munsey Trust Co.,* 332 U.S. 234, 244, 67 S.Ct. 1599, 1604, 91 L.Ed. 2022 (1947). Aetna's performance bonds state:

(a) Perform and fulfill all undertakings, covenants, terms, conditions, and agreements of said contract during the original term of said contract and any extensions thereof that may be granted by the Government, with or without notice to the Surety(ies), and during the life of any guaranty required under the contract, and shall also perform and fulfill all the undertakings, covenants, terms, conditions, and agreements of any and all duly authorized modifications of said contract that may hereafter be made, notice of which modifications to the Surety(ies) being hereby waived; and

(b) If the said contract is subject to the Miller Act, as amended (40 U.S.C. 270a–270e), pay to the Government the full amount of the taxes imposed by the Government which are collected, deducted, or withheld from wages paid by the Principal in carrying out the construction contract with respect to which this bond is furnished; then the above obligation shall be void and of no effect.

The surety has different rights under a performance bond than it has under a payment bond:

A surety that pays on a performance bond in order to complete the subject contract has priority over the United States to the retainages in its hands. A surety that pays on its payment bond, however, does not have priority when the United States is asserting a tax or other obligation owed by the prime contractor.

*United States Fidelity Guaranty Co. v. United States,* 475 F.2d 1377, 1383 (Ct.Cl. 1973). That the Government may not set off taxes owed to it by a defaulting contractor against retainages claimed by a Miller Act surety acting pursuant to its performance bond was addressed by one of our predecessor courts in *Security Insurance Co. v. United States,* 428 F.2d 838, 842 (Ct.Cl.1970). The Court of Claims held that such a surety was entitled to recover from retained funds the amount it expended in completing the contract pursuant to its performance bond, free from set off for taxes owed by the contractor. *Id.* at 839. A performing surety has this position because it has an equitable right of subrogation to the contract funds retained by the government. *Pearlman v. Reliance Insurance Company,* 371 U.S. 132, 138, 83 S.Ct. 232, 235, 9 L.Ed.2d 190 (1962).

Aetna's right to recover the monies transferred by NAVFAC to the IRS or to recover the retainages held by NAVFAC under the three contracts depends upon whether Aetna was acting in the role of a performing surety when it advanced funds directly to Mansfield and made payments to Mansfield's subcontractors and suppliers. Aetna concedes that if it expended these funds because of its payment bond obligations, "the IRS would have a priority to the remaining proceeds."

## III

The Claims Court stated that Aetna "qualifie[d] as a performing surety in this case if—and only if—it assumed the primary responsibility for the completion of the work under the several contracts." The Claims Court concluded that Aetna never assumed the responsibility for the completion of the three projects, or any of them. It noted that the language of the June 21, 1983 financing agreement provided that the funding was limited to amounts "Aetna would be obligated to provide under its payment bonds," that Aetna refused to take any action, other than providing financing, to assure the completion of the projects, and that neither Mansfield nor Aetna actually completed the work originally required under the contracts.

Aetna contends that the Claims Court applied the wrong legal standard in requiring that a performing surety assume "the primary responsibility for completion of the work." It also contends that the evidence does not support a finding that Aetna was not a performing surety and that the contract price reduction should not deprive Aetna of its status as performing surety where the contract work, as modified, was fully performed.

We agree with Aetna's position that there is no requirement that a performing surety must assume "the primary responsibility for the completion of the work." A performance bond gives the surety the option of completing performance or of assuming liability for the Government's costs in completing the contract which are in excess of the contract price. *Security Insurance Co. v. United States*, 428 F.2d at 841 n. 6. Neither formal termination of the contract by the Government nor execution of a take-over agreement by the surety is necessary in order for a surety to qualify as a performing surety. *Id.* at 839, 843. Thus, a performing surety may satisfy its obligation in various ways. For example, the surety may formally take over the project and contract for its completion, or it may allow the project to be defaulted and let the government complete or contract for the completion of the project, in which case the surety is responsible for costs in excess of the contract price. A performing surety may also satisfy its obligation by providing funds to an insolvent contractor to complete performance. *Great American Insurance Company v. United States*, 481 F.2d 1298, 1300 n. 8 (Ct.Cl.1973); *Morgenthau v. Fidelity & Deposit Co.*, 94 F.2d 632, 635 (D.C.Cir.1937) ("No difference between completion of the work by the surety ... and the furnishing of money to the contractor after his default ... to enable him to perform the contract."); *see also Morrison Assurance Co. v. United States*, 3 Cl.Ct. at 634 (surety was entitled to the status of a completing surety even though it left on-site performance and supervision to the contractor).

The government argues that the only issue before the Claims Court was Aetna's motivation, i.e., whether it was motivated by its performance bond rather than its payment bond. Although Aetna's motivation for, or intent in, making the payments is one factor to be considered, whether a surety is a performing or paying surety must be determined by an objective analysis of all the facts and circumstances of the particular case. In reviewing the facts found by the Claims Court, we are bound by the clearly erroneous standard. *Milmark Services, Inc. v. United States*, 731 F.2d 855, 857 (Fed.Cir.1984). After considering all of the factual findings, however, we are convinced that the Claims Court clearly erred in holding that Aetna was not acting as a performing surety. Although we cannot accept Aetna's contention that any provision of funds to an insolvent contractor is sufficient, in and of itself, to establish that a surety is a performing surety, the nature and extent of the financing in this case establishes that Aetna was acting as a performing surety.

The Claims Court found that the language of the June 21, 1983 agreement between Mansfield and Aetna, stating that financing was "limited to those funds which Aetna would be obligated to provide under its *payment* bonds," (emphasis in Claims Court opinion) indicated that Aetna was not "assuming the responsibility for the ultimate completion of the work on the three projects." While this language may have set an initial funding limitation as between the parties, it does not follow that Aetna was disclaiming any obligation to complete the work or to be responsible for the completion costs as its performance bond required. In fact, the agreement relied on by the Claims Court recognized that Mansfield was "financially unable to complete performance" and that it was "request[ing] Aetna's assistance in *completing* the Aetna Bonded Contracts." (Emphasis added.)

The funding limitation initially established in the June 21, 1983 agreement was not adhered to by Aetna. The Claims Court's findings show that Aetna expended $1,850,420 on the contracts, an amount which exceeded its total payment bond liability of $1,823,888.30. It provided $1,032,901 for use in the EMO contract, whereas its payment bond obligation was $608,889, and $288,584 for the Fire Station project, which exceeded its payment bond obligation of $193,888.50. Moreover, on these two contracts Aetna's payments after receiving partial reimbursements from contract funds still exceeded its payment bond obligations.

The manner in which Aetna made payments, as well as the nature of such payments both prior to and after the June 21, 1983 financing agreement, indicates that it was acting as a performing surety. The Claims Court found that Aetna, after being advised on December 7, 1982 that Mansfield was unable to meet its obligations under the three contracts, "began to fund Mansfield's operations under these contracts" and "[b]etween February and September 1983 provided Mansfield with $464,194 for use on the OCS contract; with $922,817 for use on the EMO contract; and with $252,327 for use on the Fire Station contract." Most of the payments for work on each of the three contracts were made during this period directly to Mansfield. When Mansfield advised Aetna in September 1983 that its future earnings would improve, Aetna stopped its direct payments to Mansfield but continued to pay subcontractors and suppliers. If Aetna were making the payments pursuant to its payment bonds, they would have been made directly to the laborers, subcontractors and suppliers as this was Aetna's only obligation under those bonds. Moreover, it would have ceased payments when the liability limit of the payment bonds was reached. The evidence demonstrates also that Aetna funds were to be used to pay Mansfield's expenses, such as current taxes, insurance and overhead. There was no payment bond obligation to pay these expenses and, in fact, the Miller Act, 40 U.S.C. 270a(d), specifically provides that payment of such federal taxes is a performance bond obligation.

As to payments made directly to subcontractors and suppliers after September 1983, Aetna contends that these were also made pursuant to its performance bond obligations because "[g]enerally, a surety's expenditures under a payment bond are limited to one time payments...." It cites *Aetna Casualty and Surety Co. v. United States*, 435 F.2d 1082, 1084 (5th Cir.1970) as support for its position that "payments by a surety which has issued both performance and payment bonds and which completes performance after default, are under the performance bond even if paid to labor and materialmen...." *See also North Denver Bank v. United States*, 432 F.2d 466 (Ct.Cl.1970). Since Aetna was acting as a performing surety prior to the time when direct payments to labor and materialmen were made, these periodic payments are part of the cost of completing the contract and fall within Aetna's performance bond obligations. *Cf. Security Insurance Co. v. United States*, 428 F.2d at 840, 844.

The fact that the original contracts were not fully performed does not require a different conclusion in this case. NAVFAC elected to accept Mansfield's work as complete when it took beneficial occupancy of the facilities and issued unilateral deductive change orders. Neither Mansfield nor Aetna was obligated to perform the deleted work, and the contracts as modified were therefore performed.

Because all of Aetna's payments were made under its performance bond obligations, we reverse the judgment of the Claims Court and remand. On remand the court should consider Aetna's contentions that it has the right to contest the amount of NAVFAC's reduction of the contract balances and to assert Mansfield's claim to an equitable adjustment with respect to the OCS contract.

REVERSED AND REMANDED.