**MILLER–STAUCH CONSTRUCTION COMPANY, Plaintiff/Respondent/Cross–Appellant,**

v.

**WILLIAMS–BUNGART ELECTRIC, INC., Defendant,**

and

**International Fidelity Insurance Company, Defendant/Appellant/Cross–Respondent.**

Nos. WD 52572, WD 52622 and WD 52661.

Missouri Court of Appeals, Western District.

Jan. 20, 1998.

As Modified on Denial of Rehearing March 3, 1998.

G. William Quatman, Kansas City, for Respondent/Cross–Appellant.

Robert M. Pitkin, Kansas City, for Appellant/Cross–Respondent.

Before HOWARD, P.J., and
BRECKENRIDGE and HANNA, JJ.

HOWARD, Presiding Judge.

A surety appeals from a judgment in an action involving a performance bond issued by the surety for a construction project. The International Fidelity Insurance Co. ("IFIC") contends that the trial court erred by holding that the general contractor had the right to offset funds retained under a bonded subcontract against losses sustained on an unbonded purchase order. The surety also contends that the trial court made various errors in its award of attorney's fees to counsel for the general contractor, and that the trial court erred by awarding the general contractor an additional 10% in overhead relating to bonded labor under the subcontract.

**492**

Judgment reversed; cause remanded with directions.

Miller–Stauch Construction Co., Inc. ("Miller–Stauch"), who was the general contractor on a construction project to build the new Prairie Elementary School in Prairie Village, Kansas, received a bid from the Williams–Bungart Electric Co. ("Williams–Bungart") to provide all the labor and materials necessary to complete the electrical work on the project. The bid provided that Miller–Stauch would pay for any subcontractor's bond. Based upon prior dealings between the two companies, Duane Dean, vice-president of Miller–Stauch, asked Mark Bungart of Williams–Bungart to split its bid into two parts: one for all of the materials under a written purchase order and the other for labor only under a written subcontract. The purpose of this arrangement was for Miller–Stauch to save money by purchasing a subcontractor's bond on the labor agreement only.

IFIC issued a performance bond and a payment bond covering the labor subcontract agreement. Because the electrical work had been split into two contracts, one bonded and one unbonded, IFIC's agent, Surety Bond Underwriters, drafted a rider to the bonds which stated that "[t]he surety bond will not pertain to any claims relating to supplies, materials and equipment as identified on the Proposal/contract." Miller–Stauch signed the rider and IFIC issued its performance bond and payment bonds, in the sum of $202,526.00 each, to Miller–Stauch as obligee and Williams–Bungart as principal, for the labor portion of the work. IFIC's performance bond and payment bond incorporated the labor subcontract by reference. The labor subcontract contained the following provision:

> The Contractor may withhold from Subcontractor any monies due or to become due under this or any other contract for any other project to offset the damages incurred or possibly incurred as a result of the breach. In case of a breach, the Subcontractor and its surety company shall be liable to the Contractor for any and all additional costs, expenses, attorney's fees, and other damages, both liquidated and unliquidated, which directly or indirectly result from the Subcontractor's breach or threatened breach, including interest thereon at the highest lawful rate from the date on which such sums become due until paid in full.

In early February of 1993, before the project was completed, Williams–Bungart experienced financial difficulties and advised Miller–Stauch that it would be unable to fulfill its obligations under the labor subcontract and the purchase order. In a letter dated February 15, 1993, Miller–Stauch informed IFIC that Williams–Bungart had defaulted on the project, and that Williams–Bungart had offered a replacement subcontractor, SKC Electric, Inc. ("SKCE"), who was satisfactory to Miller–Stauch. The letter further stated that "it appears that there will be a shortfall in the subcontract as to both labor and materials. Demand is hereby made that you perform under the bond obligations on behalf of your principal, Williams–Bungart Electric Co., and fulfill principal's obligations." Miller–Stauch and IFIC then accepted an $80,979.00 bid submitted by SKC Electric, Inc. ("SKCE") to complete the labor subcontract for electrical work on the project.

At the time Williams–Bungart ceased working on the project, Miller–Stauch held $76,881.19 in unpaid funds for uncompleted work on the labor subcontract. Accordingly, based upon SKCE's bid of $80,979.00, there was an anticipated shortfall of $4,097.81 for completion of the labor subcontract. IFIC paid Miller–Stauch this amount on July 22, 1993. The actual cost for SKCE to complete the labor subcontract was calculated by the parties to be $117,926.19, which resulted in an additional $36,947.19 which IFIC paid to Miller–Stauch on October 12, 1994.

At the time that Williams–Bungart ceased working on the project, it also failed to fulfill its obligations under the purchase order for materials. At the time of Williams–Bungart default, the purchase order had a remaining balance of $150,309.08, and the cost to complete the purchase order was $200,523.37, leaving a shortfall of $50,214.29. Miller–Stauch set off its $76,881.18 in unpaid funds under the labor subcontract against the loss

under the purchase order. This set-off left $26,666.90 of the unpaid labor subcontract funds to be applied to the cost of completing the labor subcontract, a cost which the parties calculated to be $117,926.19, and the trial court later determined to be $118,745.16. However, IFIC made no further payments under the performance bond beyond the $4,097.81 on July 22, 1993 and the $36,947.19 on October 12, 1994.

On October 1, 1993, SKCE sued Miller–Stauch to recover $126,716.14 for the project, of which $90,293.54 was for labor and the rest was for materials. Miller–Stauch defended itself against the SKCE claim, which Miller–Stauch ultimately paid to settle the litigation.

On October 22, 1993, Miller–Stauch sued IFIC for breach of contract, claiming that IFIC failed to perform its bond obligations. The trial court concluded that Miller–Stauch would be allowed to use $50,214.29 of the

$76,881.19 retained under the bonded subcontract to set off against losses under the unbonded material purchase order. That left $26,666.90 of the funds retained under the bonded subcontract to be actually applied to completing the bonded subcontract. Subtracting this amount (plus the $41,045.00 actually paid by IFIC) from the $118,745.16 which the trial court determined to be the cost of completing the bonded subcontract, the trial court concluded that IFIC owed Miller–Stauch $51,033.26 in completion costs under the bond. After adding $25,000.00 in attorney's fees and over $15,000.00 in interest, the trial court awarded Miller–Stauch a judgment of $91,253.68 on its breach of contract claim against IFIC. In addition, the trial court awarded $4,186.39 in overhead costs for a total judgment of $95,440.07. In tabular form, the award breaks down as follows:

Miller–Stauch's Net Loss as of 8/24/93

| | | |
|---|---|---|
| Cost to Complete Material Purchase Order | | ($200,523.37) |
| Apply Balance under Purchase Order | | $150,309.08 |
| Net Shortfall under Purchase Order | | ($ 50,214.29) |
| Set-off balance under the Subcontract | | $ 76,881.19 |
| Leaves remaining Subcontract funds | | $ 26,666.90 |
| Cost to Complete Bonded Subcontract | | ($118,745.16) |
| Net Shortfall under the Subcontract | | $ 92,078.26 |
| Less IFIC payment (7/22/93) | | $ 4,097.81 |
| | Subtotal | ($ 87,980.45) |
| Less IFIC payment (10/12/94) | | $ 36,947.19 |
| | Subtotal | ($ 51,033.26) |
| Plus interest from date of demand (8/24/93) to IFIC second payment (10/24/94) at 9% on balance of $87,980.45 | | $ 8,979.66 |
| | Subtotal | ($ 60,012.92) |
| Plus interest from date of IFIC payment (10/12/94) to date of judgment (12/31/95) at 9% on balance of $60,012.92 | | $ 6,586.00 |
| | Subtotal | ($ 66,598.92) |
| Plus attorney's fees and expenses | | $ 25,000.00 |
| | Subtotal | ($ 91,598.92) |
| Deduct Miller–Stauch calculation error | | $ 345.24 |
| | Subtotal | ($ 91,253.68) |
| Plus overhead costs per amended judgment | | $ 4,186.39 |
| | Total | ($ 95,440.07) |

In addition, the trial court awarded Miller–Stauch collateral litigation fees and expenses in the amount of $5,960.60.

■ IFIC's first two points on appeal concern the trial court's holding that Miller–Stauch would be allowed to offset $50,214.29

of the balance due on the labor subcontract against the loss on the purchase order. IFIC argues that this case is not controlled by *United States v. Munsey Trust Co.*, 332 U.S. 234, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947) on the issue of the right of

set-off, and that the trial court's decision was erroneous because it ignored the rider's provision that any surety bond would not pertain to claims relating to supplies, materials, and equipment.

 In part, this case turns on the distinction between two types of contractors' bonds: the performance bond and the payment bond. Most often, contractor's bonds are issued on behalf of the general contractor, as principal, and in favor of the public or private owner, as the obligee. But in cases like the one before us, when a subcontractor is the principal, the obligee to whom the surety's duty runs is the general contractor. A performance bond protects the obligee (in this case Miller–Stauch, the general contractor) by obligating the surety to cover any extra costs the obligee may incur to complete the project if the principal (in this case Williams–Bungart, the subcontractor) defaults. *Transamerica Insurance Company v. United States,* 31 Fed. Cl. 532, 534 n. 1 (1994). A payment bond, on the other hand, protects the sub-subcontractors and materialmen by obliging the surety to cover any of their fees left unpaid in event of the subcontractor's default. *Id.*

 Thus, although the actual expenses paid under each bond may often be similar, the payment bond and performance bond are distinguished by different obligations assumed by the surety. *Morrison Assurance Company, Inc. v. United States,* 3 Cl.Ct. 626, 632 (1983). In the case of a performance bond, the surety has the option of completing performance or of assuming the liability for the obligee's costs in completing the contract which are in excess of the contract price. *Aetna Cas. and Sur. Co. v. U.S.,* 845 F.2d 971, 975 (Fed.Cir.1988). In other words, the performing surety may formally take over the project and contract for its completion, or it may allow the project to be defaulted and let the obligee complete or contract for the completion of the project, in which case the surety is responsible for costs in excess of the contract price. *Id.* Under the payment bond, on the other hand, the surety is responsible for certain unsatisfied debts of its principal and has no responsibility related to

the completion of the project. *Morrison,* 3 Cl.Ct. at 632.

In short, the responsibility of a performing surety relates to the completion of the project triggered by the default of the principal, and the performing surety's liability ordinarily corresponds to the cost of the completion of the contract less the unpaid contract balance as of the time of default. Such is the case here, and the issue of set-off relates to IFIC in its role as a performing surety.

There has been an evolution in the law with respect to the priority of the surety's right to contract funds as against the obligee who has a claim to set-off against those funds. The leading case is *Munsey,* which involved a payment bond. In *Munsey,* the contractor completed performance but left suppliers unpaid. The surety paid the suppliers and claimed the contract retainage. The federal government resisted the surety's claim and sought to set off claims which it had against the contractor arising out of other unbonded contracts. The U.S. Supreme Court upheld the federal government's right of set-off.

Subsequently, *Standard Accident Ins. Co. v. United States,* 119 Ct.Cl. 749, 97 F.Supp. 829 (1951) held that the United States had a similar priority right of set-off as against a performance bond surety. However, more recently *Trinity Universal Insurance Company v. United States,* 382 F.2d 317 (5th Cir.1967), *Security Insurance Co. of Hartford v. United States,* 192 Ct.Cl. 754, 428 F.2d 838 (1970), *Aetna Casualty and Surety Company v. United States,* 435 F.2d 1082 (5th Cir.1970), and *Morrison,* have rejected the decision in *Standard Accident* and it appears to be the generally accepted rule that, although the obligee may have a right of set-off against the surety under a payment bond, the obligee does not have a right of set-off against the surety under a performance bond. In other words, the rule of *Munsey* does not apply to a performance bond.

This line of cases making a distinction between a performance bond and payment bond has been recognized by this court in *U.S. Fid. & Guar. v. Hwy. & Transp. Com'n,* 783 S.W.2d 516 (Mo.App. W.D.1990). There,

we also rejected the obligee's argument that, as both a performance bond and a payment bond were issued, the surety's obligation for certain materials and labor was under the payment bond and not for performance. 783 S.W.2d at 520.

Miller–Stauch argues that IFIC agreed to the set-off exercised by Miller–Stauch in this case because IFIC's bonds incorporated the subcontract agreement, which stated that "[t]he Contractor may withhold from Subcontractor any monies due or to become due under this or any other contract for any other project to offset the damages incurred or possibly incurred as a result of [Subcontractor's] breach." Of course, this subcontract language does not give Miller–Stauch the right to withhold funds *from IFIC* to offset damages elsewhere; it gives Miller–Stauch the right to withhold such funds *from Williams–Bungart.* Miller–Stauch wants us, in effect, to add words to the quoted language so that it reads: "[t]he Contractor may withhold from Subcontractor *or its surety* any monies due or to become due ..."

Because the subcontract language gives Miller–Stauch set-off rights only as against the Subcontractor, Miller–Stauch is invoking the principle which states that parties are deemed to enter into their contracts in contemplation of the law as it exists at the time, and the existing law is a part of the contract as if it were written therein. *Carroll v. Oak Hall Associates, L.P.,* 898 S.W.2d 603, 607 (Mo.App. W.D.1995). Essentially, Miller–Stauch contends that, pursuant to *Sheffield Assembly of God v. American Ins.,* 870 S.W.2d 926, 932 (Mo.App. W.D.1994), a surety's liability for contract damages is co-extensive with the liability of the principal, and therefore, because Williams–Bungart is subject to the right of offset under the subcontract, so too is IFIC.

■ However, while it is true that the rights and liabilities of a surety are measured by those of the principal, it is also true that a performance bond surety confers a benefit upon the obligee and thus becomes subrogated not only to the rights of the principal but also to the rights of the obligee, and has a right to retained funds free from set-off by the obligee. *U.S. Fid. & Guar.,* 783 S.W.2d

at 520. Miller–Stauch's suggestion that we look to existing precedent to broaden the express terms of the subcontract to include a right of set-off against the surety is not persuasive.

Because the issue of set-off in this case relates to IFIC in its role as a performing surety, the trial court erred by allowing Miller–Stauch to offset $50,214.29 of the balance due on the labor subcontract against the loss on the purchase order. This portion of IFIC's appeal is meritorious, and we will address the specific relief to be given IFIC at the conclusion of this opinion.

■ In its third point on appeal, IFIC disputes the $25,000.00 in attorney's fees which the trial court included in the damages awarded to Miller–Stauch in this case. Article 18 of the subcontract agreement between Miller–Stauch and Williams–Bungart includes the provision that, in the case of a breach by the subcontractor,

> the Subcontractor and its surety company shall be liable to the Contractor for any and all additional costs, expenses, attorney's fees, and other damages, both liquidated and unliquidated, which directly or indirectly result from the Subcontractor's breach or threatened breach, including interest thereon at the highest lawful rate from the date on which such sums become due until paid in full.

In addition, Article 4.2 of the performance bond states that the cost of completion includes "the Obligee's legal and design professional costs resulting directly from the Principal's default." In Count V of Miller–Stauch's petition, it sought a declaratory judgment that "IFIC is obligated to pay Miller–Stauch for its damages incurred due to Williams–Bungart's breach of the bonded Subcontract Agreements, including attorney's fees incurred as a result."

The trial court granted Miller–Stauch the declaratory relief it sought, and calculated the amount of attorney's fees due Miller–Stauch from Exhibit 85, which consisted of the invoices submitted by Miller–Stauch's counsel, and which totaled $48,363.96 for the period from 2/12/93, the time of Williams–

Bungart's default, to 10/10/95, a week before trial. In its judgment, the trial court stated:

> [i]t is clear from the evidence that a considerable amount of plaintiff's attorney's fees and expenses resulted from the dispute as to what was and what was not covered by IFIC's bonds. The trial court has expertise in determining from the evidence the attorney's fees that are necessary and reasonable for the work done by counsel for M–S on the bonded portion of the project. Based upon the evidence, the court finds that the necessary and reasonable attorney's fees incurred for work related to the bonded portion of the project is $25,000.00 and that M–S is entitled to recover such amount from IFIC.

It appears from the judgment that the trial court isolated the amount of attorney's fees resulting from Williams–Bungart's default or breach, and therefore compensable under Article 18 of the subcontract agreement and Article 4.2 of the performance bond, from the amount of attorney's fees relating to the dispute which resulted in the instant litigation.

■ We defer to the determination of the trial court, which is considered to be an expert on the question of attorney's fees. *Roberts v. McNary,* 636 S.W.2d 332, 338 (Mo. banc 1982) (overruled in part on other grounds in *Keller v. Marion County Ambulance Dist.,* 820 S.W.2d 301 (Mo. banc 1991)). The setting of attorney's fees is within the sound discretion of the trial court and should not be reversed unless the award is arbitrarily arrived at or is so unreasonable as to indicate indifference and lack of proper judicial consideration. *Id.* We cannot conclude that the award in the case at bar constitutes an abuse of discretion. Point denied.

In its cross-appeal, Miller–Stauch claims that the trial court should have awarded attorney fees under §§ 375.296 and 375.420, contending that such an award is justified by IFIC's vexatious refusal to pay. However, the payment dispute between the parties in this case concerned how much IFIC was obligated to pay to complete performance, and IFIC's position in this dispute was meritorious. Therefore, we cannot say that the trial court abused its discretion by refusing to award statutory attorney's fees on the ground of a vexatious refusal to pay.

■ IFIC's fourth point on appeal concerns the fact that, in response to a post-trial motion filed by Miller–Stauch, the trial court awarded Miller–Stauch an additional $4,186.39 for overhead costs, which were calculated as an additional 10% of the costs of completing the subcontract. IFIC claims that the trial court erred in awarding this additional amount because such an award was not justified under the bond and resulted in the unjust enrichment of Miller–Stauch.

At trial, Miller–Stauch offered evidence of the overhead costs, but the trial court did not award them to Miller–Stauch in its original judgment because the trial court determined it was impossible to separate out which portion of the overhead work was covered by the bond. Then, in its post-trial motion, Miller–Stauch suggested that the amount could be computed by *not* offsetting the money retained under the bonded subcontract:

| | |
|---|---|
| Cost to complete labor | $118,745.16 |
| Less labor subcontract balance | 76,881.19 |
| Net cost to complete | 41,863.97 |
| Ten percent overhead | 4,186.39 |

The trial court adjusted its award accordingly, and IFIC offers no persuasive legal argument that this was erroneous. Point denied.

■ In its fifth point on appeal, IFIC claims that the $5,960.60 in attorney's fees which the trial court awarded to Miller–Stauch for collateral litigation was duplicative of the fees included in the $25,000.00 award. Again, we defer to the trial court's expertise in setting attorney's fees. *Roberts,* 636 S.W.2d at 338. Furthermore, in its perfunctory, half-page argument, which does not substantively address the issue set out in its point on appeal, IFIC cites no legal authority and does not specify which of the multiple entries on each of the over 100 pages of legal invoices in the record constitute duplications. It is not our duty to search the record in an effort to find facts to support IFIC's general assertion of error, as that would be tantamount to becoming its advocate. *See Cain v. Richart,* 781 S.W.2d 265, 266 (Mo.App. S.D. 1989). Point denied.

In the interest of laying litigation to rest, Rule 84.14 permits the appellate court to give such judgment as the trial court ought to have given, if the record permits it. *Hill, Lehnen & Driskill v. Barter Systems,* 707 S.W.2d 484, 487 (Mo.App. W.D.1986). In this case, the facts bearing on the merits of the case were fully developed, and there is no occasion for a new trial, and therefore it remains only to enter the correct judgment. *Id.*

In calculating the correct judgment, we note that, prior to trial, the parties agreed that it would cost $117,926.19 to complete the bonded subcontract. If Miller–Stauch had applied all of its $76,881.19 in retained funds to completing the bonded subcontract, that would have left $41,045.00 that IFIC was obligated to pay in order to complete the bonded subcontract. And, $41,045.00 is the exact amount which IFIC did, in fact, pay to Miller–Stauch. Therefore, the $51,033.26 which the trial court determined that IFIC still owed to complete the contract, plus the interest thereon, were erroneously awarded to Miller–Stauch. That leaves a proper award of $35,965.96, consisting of $25,000.00 in attorney's fees, plus $4,186.39 in overhead costs to complete the bonded subcontract, plus collateral litigation fees and expenses in the amount of $5,960.60, plus $818.97 which the trial court attributed to Harworth Construction Co. and added to the $117,926.19 stipulated by the parties.

Accordingly, the judgment is reversed and remanded to the trial court with directions to enter a new judgment in the corrected sum of $35,965.96, said judgment to bear interest at the rate of 9% per annum from March 28, 1996, the date of the trial court's judgment.

All concur.